In the Matter of the Application of WILLIAM L. SHERRILL, et al., Appellants, for a Writ of Mandamus against JOHN F. O'BRIEN, Secretary of State, Respondent.

In the Matter of the Application of WALTER PENDLETON, Appellant, for a Writ of Mandamus against JOHN F. O'BRIEN, Secretary of State, Respondent.

In the Matter of the Application of GEORGE E. PAYNE et al., Appellants, for a Writ of Mandamus against JOHN F. O'BRIEN, Secretary of State, Respondent.

1. LEGISLATIVE APPORTIONMENT — JURISDICTION OF SUPREME COURT. The Supreme Court has express jurisdiction to determine whether or not an act of apportionment is in conflict with the limitations fixed by the Constitution, and, if such conflict is found to exist, to declare the act void. (Const. 1894, art. III, § 5.)

2. REVIEW BY COURT OF APPEALS. While the Constitution does not expressly confer jurisdiction upon the Court of Appeals to review an act of apportionment, that court has such power by virtue of its general jurisdiction to review actual determinations of the Appellate Division. (Const. art. VI, § 9; Code Civ. Pro. §§ 190, 191.) Upon such an appeal the questions reviewable are:

(1) Whether the legislature has violated a mandatory provision of the Constitution.

(2) Whether an act of apportionment, in those matters as to which under the Constitution there is necessarily vested in the legislature some discretion, transcends all reasonable exercise of discretion and palpably violates the plain intent of the Constitution in disregard of its spirit and the purpose for which its express limitations were enacted.

3. POWERS AND LIMITATIONS OF THE LEGISLATURE. Although an act of the legislature is the voice of the people speaking through their representatives, the authority of the representatives in relation to an apportionment is a delegated authority wholly derived from and dependent upon the Constitution; no general power is vested in the legislature to change or modify the number of its members or the districts from which they are to be elected; the provisions of the Constitution constitute the full authority of the legislature; an examination of the Constitutions of the State from the first, adopted in 1777, to the last, adopted in 1894, together with the proceedings of the constitutional convention of 1894, shows an intentional and gradual withdrawal from the legislature of discretionary power and a continued adding of limitations upon its power in the matter of apportionment, so that only the minimum of discretion, necessary to preserve county and other lines and to give reasonable consideration to the other provisions of the Constitution, is left to the legislature.

4. LIMIT OF LEGISLATIVE DISCRETION. The limit of legislative discretion in the division of the state into senatorial districts is to make as close an approximation to equality in the number of inhabitants as is reasonably possible. (Const. art. III, § 4.)

5. APPORTIONMENT OF SECOND SENATORIAL DISTRICT INVALID. The formation of the second senatorial district by the joinder of Richmond and Queens counties violates the Constitution. Although by the uniform and consistent action of the various constitutional conventions Richmond county is an exception to the constitutional provision that senatorial districts must be formed from contiguous territory, the joinder of said county to the county of Queens to constitute the second senatorial district violates the Constitution because the population of Queens county under the census of 1905 being far in excess of the ratio for apportioning senators requires that Queens county should constitute a separate senatorial district.

6. APPORTIONMENT OF THIRTEENTH SENATORIAL DISTRICT INVALID. The thirteenth senatorial district laid out in the borough of Manhattan in the city of New York violates the constitutional provision that senatorial districts shall be as compact in form as practicable.

7. APPORTIONMENT ACT WHOLLY INVALID. The violation of the constitutional provisions in the formation of the second and thirteenth senatorial districts so affects the entire Apportionment Act (L. 1906, ch. 431) as to render it wholly unconstitutional and void.

8. VALIDITY OF ACTS OF LEGISLATURE, ELECTED UNDER APPORTIONMENT ACT. Notwithstanding the invalidity of the Apportionment Act the legislature elected by the people at the last general election is a *de facto* body and its acts are in all respects valid. As a *de facto* body each house has, under the Constitution, not only the exclusive power but the exclusive right to judge of the title of any of its members to a seat therein. Whoever either house receives as its legally elected member and entitled to a seat, becomes thereby a *de jure* member of that house; so that each member thereof, so long as the particular house to which he has been elected does not oust him, is not only a *de facto* but a *de jure* officer, entitled to all the privileges and emoluments of his office, and his title thereto cannot be challenged before any tribunal except the house itself.

9. NEXT ELECTION MUST BE HELD UNDER NEW ACT or UNDER CONSTITUTIONAL APPORTIONMENT OF 1894. While the courts cannot pass on the title of any present member of the legislature, they can control the action of administrative officers in the conduct of the next election that takes place. If the present legislature should pass a new apportionment act in compliance with the Constitution, the next general election at which members of either house are elected will be held under the new statute. If the legislature fails to discharge this duty then the election must be held in accordance with the apportionment of the Constitution of 1894.

*Matter of Sherrill* v. *O'Brien*, 114 App. Div. 890, reversed.
*Matter of Pendleton* v. *O'Brien*, 114 App. Div. 890, reversed.
*Matter of Payne* v. *O'Brien*, 114 App. Div. 890, reversed.

Argued January 28, 1907; decided April 3, 1907.)

Appeal in each of the above-entitled proceedings from an order of the Appellate Division of the Supreme Court in the third judicial department, entered September 12, 1906, which affirmed an order of Special Term denying a motion for a peremptory writ of mandamus directing the secretary of state to transmit to the county clerk of each county, and to the board of elections of the city of New York, election notices as provided by section 5 of the Election Law, and that he embrace in said election notices the number of senators and members of assembly to be voted for at the election to be held on November 6, 1906, required and allowed to be voted for under the apportionment contained in the Constitution of this state, and not according to the apportionment contained in chapter 431 of the Laws of 1906.

An appeal from orders of the same date in each of the above-entitled proceedings was argued in this court on September 28, 1906, and the appeals were dismissed October 1st, 1906. (*Matter of Sherrill* v. *O'Brien*, 186 N. Y. 1.) The relators thereafter applied to the Appellate Division and obtained a modification of the order *nunc pro tunc* in each of the proceedings so as to read "That the order appealed from be and hereby is affirmed and the writ refused on a question of law only," and from the order as so amended in each case a new appeal has been taken to this court.

By chapter 431 of the Laws of 1906 the legislature divided the state into fifty-one senate districts and also provided the number of assemblymen to be elected in each county. Prior to the passage of that act an enumeration of the inhabitants of the state had been taken as provided by the Constitution of 1894. The following is a statement of the senatorial districts as provided by said act with the name of the county or counties from which each is formed, and the number of inhabitants, excluding aliens therein :

District No. 1.

| | | |
|---|---|---|
| Suffolk.... .................. ...... | 75,634 | |
| Nassau... .... ............. .... | 61,541 | |
| | | 137,175 |

District No. 2.

 Queens........................        179,746

 Richmond...................  ....        66,441

                246,187

Districts Nos. 3 to 10.

 Kings.......................  .........        1,178,782

 Average population to a district...  .........        147,347

Districts Nos. 11 to 22.

 New York.......  ..............        1,800,292

 Average population to a district..............        150,024

District No. 23.

 Westchester...............        202,650        202,650

District No. 24.

 Orange.....  .  ...............        101,644

 Rockland....  .............        41,240

                142,884

District No. 25.

 Columbia.....  ...............        41,268

 Dutchess....................  .....        77,864

 Putnam......  ................        13,083

                132,215

District No. 26.

 Greene.....................        30,317

 Ulster......................        83,302

                113,619

District No. 27.

 Delaware.....  ...............        46,013

 Sullivan.....................        33,592

 Chenango......  .....  .....  ....        36,253

                115,858

District No. 28.

 Albany....  .........  ...  .........        163,983        163,983

District No. 29.

 Rensselaer...................        118,732        118,732

District No. 30.

 Washington.....  ...........        45,560

 Essex.......  .............  .....        31,161

 Clinton................  ......  .        45,618

                122,339

District No. 31.

| | | |
|---|---:|---:|
| Saratoga........................ | 60,543 | |
| Schenectady.................... | 64,817 | |
| | | 125,360 |

District No. 32.

| | | |
|---|---:|---:|
| Warren........................ | 31,107 | |
| Fulton ........................ | 40,656 | |
| Hamilton...................... | 4,729 | |
| Montgomery.................... | 46,650 | |
| | | 123,142 |

District No. 33.

| | | |
|---|---:|---:|
| Herkimer...................... | 51,040 | |
| Otsego........................ | 47,664 | |
| Schoharie...................... | 24,936 | |
| | | 123,640 |

District No. 34.

| | | |
|---|---:|---:|
| St. Lawrence.................. | 84,866 | |
| Franklin ...................... | 42,930 | |
| | | 127,796 |

District No. 35.

| | | |
|---|---:|---:|
| Jefferson ..................... | 74,680 | |
| Lewis......................... | 26,016 | |
| | | 100,696 |

District No. 36.

| | | |
|---|---:|---:|
| Oneida........................ | 131,393 | 131,393 |

District No. 37.

| | | |
|---|---:|---:|
| Oswego........................ | 68,847 | |
| Madison....................... | 39,052 | |
| | | 107,899 |

District No. 38.

| | | |
|---|---:|---:|
| Onondaga..................... | 169,732 | 169,732 |

District No. 39.

| | | |
|---|---:|---:|
| Cortland...................... | 28,912 | |
| Broome........................ | 69,981 | |
| Tioga......................... | 26,596 | |
| | | 125,489 |

District No. 40.
  Chemung........ ...........     50,584
  Schuyler............. .........     14,921
  Tompkins............. .........     33,350
                                                  98,855
District No. 41.
  Cayuga...................     63,018
  Seneca.......................     24,751
  Yates......... ...............     19,086
                                                  106,855
District No. 42.
  Wayne...................     47,022
  Ontario.... .............·.. ......     50,695
                                                  97,717
District No. 43.
  Steuben.... ................     80,638
  Allegany........ ...........     42,224
                                                  122,862
District No. 44.
  Genesee..... ................     34,282
  Wyoming.... ........... ......     30,775
  Livingston ...................     34,943
                                                  100,000
Districts No. 45 and 46.
  Monroe...... ........... ......     225,609     225,609
  Average population to a district.............     112,804
District No. 47.
  Niagara ....................     77,250
  Orleans ... ...... . ..........     30,078
                                                  107,328
Districts Nos. 48, 49 and 50.
  Erie ........................     438,577
  Average population to a district ... .........     146,192
District No. 51.
  Chautauqua .. .................     91,923
  Cattaraugus .:...... ............     63,399
                                                  155,322

The following is a diagram of the county of New York showing the island of Manhattan from Thirty-third street southerly, including its division into senate districts:

Further facts will be found in the opinion.

*Eugene Lamb Richards, Jr.,* and *William Allaire Shortt* for Walter Pendleton, appellant. Counties united in a senate district must be contiguous. (Const. of N. Y. art. 3, § 4; *People ex rel. Carter* v. *Rice,* 135 N. Y. 473; *People* v. *Carlock,* 198 Ill. 150; *People* v. *Thompson,* 155 Ill. 451.) The counties of Queens and Richmond are not contiguous. (*Bent* v. *Gaenzer,* 17 Misc. Rep. 570; *Houghtaling* v. *Groesbeck,* 51 N. Y. 673; *Matter of Ward,* 52 N. Y. 397; *Halston Co.* v. *Campbell,* 89 Va. 396; *Josh* v. *Josh,* 5 C. B. [N. S.] 465; *Ackers* v. *U. C. & R. Co.,* 43 N. J. L. 112; *McCullough* v. *Impt. Co.,* 48 N. J. Eq. 187; *South Orange* v. *Wittingham,* 58 N. J. L. 655; *State* v. *Downs,* 59 N. H. 321; *Peverelly* v. *People,* 3 Park. Cr. Rep. 70; *Yard* v. *O. B. Assn.,* 42 N. J. Eq. 306.) The court below was in error as to the effect of practical construction on the status of Richmond county. (*Houghtaling* v. *Groesbeck,* 51 N. Y. 672; *H. S. & P. Co.* v. *Campbell,* 89 Va. 396; *Supervisors* v. *Blacker,* 92 Mich. 638; *People* v. *Albertson,* 55 N. Y. 50; *People* v. *Allen,* 42 N. Y. 404; *McPherson* v. *Blacker,* 146 U. S. 1; *Fairbank* v. *U. S.,* 181 U. S. 308; *Martin* v. *Hunter,* 1 Wheat. 328; *U. S.* v. *Dickson,* 15 Pet. 141; *State* v. *Wrightson,* 56 N. J. L. 208.) The inequality in the attempted re-apportionment is so gross as to constitute an abuse of discretion. (*People ex rel. Carter* v. *Rice,* 135 N. Y. 473; *Baird* v. *Bd. of Suprs.,* 138 N. Y. 95.)

*Elon R. Brown* for William L. Sherrill et al., appellants. The Appellate Division in sustaining this apportionment has overlooked the manifest intention of the framers of the Constitution to adopt new and stricter rules for the apportionment of senate districts; to substitute rules for legislative discretion. (Const. of N. Y. art. 3, § 4; Debates of Const. Conv. of 1894, vol. 5, p. 708.) The Supreme Court has express power to review an apportionment act. (Const. of N. Y. art. 3, § 4; *People ex rel. Carter* v. *Rice,* 135 N. Y. 484.) The

example of approximate exactness in the numerical apportion-
ment of 1894 by the constitutional convention is proof of the
intention of the convention as to the meaning of the rules
that should govern future apportionments. (Record of Const.
Conv. of 1894, vol. 5, p. 713.) The provisions of the
Constitution have been grossly violated in letter and in spirit
by the present apportionment. (Const. of N. Y. art. 3, § 4.)
The alleged difficulty with Richmond county by reason of the
" contiguous clause " is a subterfuge. It has no substance and
cannot avail to produce substantial inequality. (Const. of
N. Y. art. 3, § 4.) The limitations in senate representation
from counties having more than three senators have no appli-
cation either in word or principle to Queens and Richmond as
parts of Greater New York. (Report of Committee on
Apportionment, vol. 5, p. 708 ; Address to the People, vol. 4,
p. 1251, sub. 9, p. 1253.) The rule that "counties * * *
which from their location may be included in either of two
districts, shall be so placed as to make said districts most nearly
equal in number of inhabitants, excluding aliens," has been
repeatedly violated in the apportionment as made. (Const.
of N. Y. art. 3, § 4 ; *People ex rel. Carter* v. *Rice*, 135 N. Y.
484.) The legislature has violated the requirement of the
Constitution as to compactness of senate districts. (Const. of
N. Y. art. 3, § 4.)

*Edward B. Whitney* and *Robert Grier Monroe* for George
E. Payne et al., appellants. The apportionment is void on
account of its violation of the rights of Queens county.
(Const. of N. Y. art. 3; § 4 ; 1 Story on Const. 407 ; Cooley's
Const. Lim. [7th ed.] 603–606 ; *Fairbank* v. *U. S.*, 181 U. S.
283 ; *People* v. *Allen*, 42 N. Y. 378.) The constitutional
requirement of compactness has been repeatedly violated by
flagrant gerrymanders. (Const. of N. Y. art. 3, § 4.)

*Julius M. Mayer*, *James G. Graham* and *Merton E.
Lewis* for apportionment. The constitutional requirements
have been complied with. (*Smith* v. *Suprs.*, 148 N. Y. 187 ;
*People* v. *Thompson*, 155 Ill. 451 ; *People* v. *Carlock*, 198

13

Ill. 150.) The constitutional provision as to equality in number of inhabitants is not violated by chapter 431 of the Laws of 1906. (*I. & S. L. R. R. Co.* v. *Horst*, 3 Otto, 300; *E. S. M. Co.* v. *Park*, 14 Blatchf. 414; *Beardsley* v. *Littell*, 14 Blatchf. 105; *Reed* v. *Smith*, 42 Col. 251; *Prouty* v. *Storm*, 11 Kans. 261; *People* v. *Carlock*, 198 Ill. 150; *People* v. *Thompson*, 155 Ill. 451; *Giddings* v. *Blacker*, 92 Mich. 1; *Houghton County* v. *Blacker*, 92 Mich. 638; *People* v. *Broome*, 20 N. Y. Supp. 470.) The constitutional provision as to compactness is not violated. (*People* v. *Thompson*, 155 Ill. 451; *Matter of Baird*, 142 N. Y. 523; *People* v. *Gailter*, 149 Ill. 39.) The constitutional provision that the district shall at all times consist of contiguous territory has been observed. (*People ex rel. Williams* v. *Dayton*, 55 N. Y. 378; *People ex rel. Joyce* v. *Brundage*, 78 N. Y. 403; *Houghton County* v. *Blacker*, 92 Mich. 638.) Unless the statute is unconstitutional beyond any doubt, it is the duty of the court to declare it constitutional. (*Parker* v. *State*, 133 Ind. 178; *State* v. *Campbell*, 48 Ohio St. 435; *People ex rel. Kemmler* v. *Durston*, 119 N. Y. 169; *People ex rel. Carter* v. *Rice*, 135 N. Y. 473; *Rose* v. *Goddard*, 52 Barb. 533; *Ford* v. *Cummings*, 90 Hun, 481; *McGrath* v. *Grout*, 69 App. Div. 315; *People ex rel. Sinkler* v. *Terry*, 108 N. Y. 1; *Matter of N. Y. & L. I. B. Co.*, 148 N. Y. 551.)

*William S. Jackson, Attorney-General* (*George P. Decker* of counsel), for respondent. If the apportionment attacked is not in accord with the requirements of the Constitution, there are no consequences which should deter this court from holding it invalid, since the legislators, elected in the year 1906, would remain *de facto* officers. (*People* v. *Rumsey*, 19 N. Y. 41; *Houghton County* v. *Blacker*, 92 Mich. 638; *Giddings* v. *Blacker*, 92 Mich. 1; *State* v. *Cunningham*, 81 Wis. 440.) If this court should conclude and declare the apportionment of 1906 unconstitutional, it would still be competent for the legislature to make another, and its power and duty so to do would continue until performed. (*People ex rel. Carter* v.

*Rice*, 135 N. Y. 473.)   An obligation rests upon this court to pass upon the merits of the controversy.   (Const. of N. Y. art. 3, § 5.)

CHASE, J.   The validity of the so-called Apportionment Act of 1906 is assailed, and it is claimed that some of its provisions relating to the division of the state into senatorial districts are contrary to express constitutional provision, and that other provisions thereof constitute such an arbitrary use of alleged discretionary power as to be wholly invalid and void.   The power of this court to review the questions involved in the relator's claim should be first considered.

In the United States the general power and authority of the judicial department of the Federal and of the State governments to determine the constitutional validity of legislative acts applicable to and involved in a pending controversy is not now open to question.   It is also expressly provided by section 5 of article 3 of our State Constitution of 1894 that an apportionment by the Legislature or other body " Shall be subject to review by the Supreme Court, at the suit of any citizen, under such reasonable regulations as the Legislature may prescribe ; and any court before which a cause may be pending involving an apportionment shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same."

This constitutional provision is new, and it was intended to and does set at rest any further claim that the legislature in passing an act reapportioning the state for legislative purposes is so far exercising a political, as distinguished from a legislative power, that its action cannot be reviewed by the courts.   The jurisdiction of the Supreme Court of this state to *review* an apportionment by the legislature or other body is now express, but the jurisdiction to review such an act of apportionment is not expressly given by Constitution to this court.   The jurisdiction of this court to review the orders appealed from is the general jurisdiction of the court to review actual determinations made by the Appellate Division of the Supreme Court of

orders finally determining special proceedings (Constitution, art. 6, sec. 9 ; Code Civ. Pro. sec. 190) and the jurisdiction of the court is limited to the review of questions of law. (Constitution, art. 6, sec. 9 ; Code Civ. Pro. sec. 191, sub. 3.) The determination of every question of law involved in the appeals is within the jurisdiction of this court.

In the opinion of Judge ANDREWS in *People ex rel. Carter v. Rice* (135 N. Y. 473, 521), referring to the jurisdiction of this court in determining the constitutionality of the Apportionment Act of 1892 (Laws of 1892, chap. 397) he said : " I shall not undertake to show that the question presented is of judicial cognizance. That it is a judicial question cannot under the authorities be denied. The legislature and the courts are alike bound to obey the Constitution, and if the legislature transgresses the fundamental law and oversteps in legislation the barriers of the Constitution, it is a part of the liberties of the people that the judicial department shall have and exercise the power of protecting the Constitution itself against infringement. The power of the courts to set aside an unconstitutional apportionment has quite recently been asserted and exercised by the courts of Wisconsin and Michigan. (*State ex rel. Raymer* v. *Cunningham,* 51 N. W. Rep. 1133 ; *Giddings* v. *Blacker,* 52 id. 944; *Supervisors of Houghton County* v. *Blacker, Secretary of State,* id. 951.)"

Although the language quoted is taken from a dissenting opinion, the opinion of the court by Judge PECKHAM does not deny the power of the court to review an act of apportionment, but it says (page 501) : " We think that the courts have no power in such case to review the exercise of a discretion entrusted to the legislature by the Constitution unless it is plainly and grossly abused. \* \* \* We do not intimate that in no case could the action of the legislature be reviewed by the courts. Cases may easily be imagined where the action of that body would be so gross a violation of the Constitution that it could be seen that it had been entirely lost sight of and an intentional disregard of its commands both in the letter and in the spirit had been indulged in."

And Judge GRAY in his concurring opinion in the same case (page 510) says: "But if any provision of the fundamental law of the state intended to secure the equal representation of its citizens in the legislative department has been violated by the act in question, it is then properly the duty of the judicial department of power to declare it unconstitutional and, therefore, void. The judiciary has a duty to pronounce all legislative acts null which are contrary to the manifest tenor of the Constitution of the state."

The jurisdiction of this court was again considered in *Matter of the Application of Baird* v. *Board of Supervisors of the County of Kings* (138 N. Y. 95), which involved the division of the county of Kings into assembly districts as provided by said chapter 397 of the Laws of 1892, and this court held that the division that had been made was not a constitutional division, and the court, among other things, said: "The proper discharge of the duty of division by the board implies considerable discretion in the formation of the various districts. The discretion exercised must be an honest and a fair discretion arising out of the circumstances of the case and reasonably affecting the exercise of the power of equal division."

Since the Constitution of 1894 the case of *Matter of Smith* v. *Board of Supervisors, St. Lawrence Co.* (148 N. Y. 187) has been before this court, and it was said that "Each case must be decided on its peculiar facts, and the courts can be relied upon at all times to enforce the Constitution in its letter and spirit."

The courts have jurisdiction to determine whether or not an act of apportionment is in conflict with the limitations fixed by the Constitution, and if such conflict is found to exist, to declare the act void. (American & English Ency. of Law [2nd ed.], vol. 2, page 485 and cases cited.) It appears, therefore, that the courts can review legislative action in reapportioning the state and that on an appeal to this court jurisdiction should be entertained.

1. Where the question to be determined on the appeal is as

to whether the legislature has obeyed a mandatory provision of the Constitution, in which case a question of law is, presented for the determination of this court.

2. Where by the Constitution some discretion is vested in the legislature this court cannot inquire into the motives of the legislators in exercising such discretion and voting for a particular plan of apportionment and it cannot inquire into the relative merits of several plans to choose from which requires the exercise of sound judgment and judicial discretion. But if the legislature under the assumption of an exercise of discretion does a thing which is a mere assumption of arbitrary power, and which, in view of the provisions of the Constitution, is beyond all reasonable controversy, a gross and deliberate violation of the plain intent of the Constitution and a disregard of its spirit and the purpose for which express limitations are included therein, such act is not the exercise of discretion but a reckless disregard of that discretion which is intended by the Constitution. Such an exercise of arbitrary power is not by authority of the People. It is an assumption, and when it is claimed that an act is thus in violation of the Constitution a question of law is presented for the determination of this court.

A legislative apportionment act cannot stand as a valid exercise of discretionary power by the legislature when it is manifest that the constitutional provisions have been disregarded any more than an order of the Appellate Division can create a question of fact by declaring that there is one when no question of fact exists. (See *Matter of Totten*, 179 N. Y. 112, and *Penryhn Slate Co.* v. *Granville Elec. Light & Power Co.*, 181 N. Y. 80.) Any other determination by the courts might result in the constitutional standards being broken down and wholly disregarded.

We have seen that an apportionment may be such as to require that the act be declared invalid and void as a matter of law. Let us look then to the authority of the legislature.

The People are vested with the supreme and sovereign authority. The Constitution is the voice of the People speak-

ing in their sovereign capacity. (*Matter of N. Y. Elevated R. R. Co.*, 70 N. Y. 327, 342.)

An act of the legislature is the voice of thé People speaking through their representatives. The authority of the representatives in the legislature is a delegated authority and it is wholly derived from and dependent upon the Constitution.

By our first Constitution, adopted April 20, 1777, it is provided " That the supreme legislative power within this state, shall be vested in two separate and distinct bodies of men ; the one to be called the Assembly of the state of New York ; and the other to be called the Senate of the state of New York ; who, together, shall form the legislature, * * *." (Section 2.)

Our Constitution, adopted November 6, 1894, provides that " The legislative power of this State shall be vested in the Senate and Assembly." (Article III, section 1.) The general legislative power is absolute and unlimited except as restrained by Constitution. (*Bank of Chenango* v. *Brown*, 26 N. Y. 467 ; *People ex rel. McLean* v. *Flagg*, 46 N. Y. 401.) It will be observed, however, that no general power is by the Constitution vested in the legislature, to change or modify the number of its members or the districts from which they are to be elected. The Constitution has always included special provisions relating thereto and such special provisions constitute the full authority of the legislature. It is the authority of the legislature over itself that we must examine and study to aid in determining the questions before us.

By the Constitution of 1777 it was provided that the senate should consist of twenty-four freeholders. Section 12 provided " That the election of senators shall be after this manner : That so much of this state as is now parcelled into counties, be divided into four great districts : the southern district to comprehend * * *. That the senators shall be elected by the freeholders of the said districts, qualified as aforesaid, in the proportions following, to wit : In the southern district, nine. * * * And be it ordained, that a census shall be taken as soon as may be after the expiration of seven years from the termination of the present war, under the direc-

tion of the legislature; and if, on such census, it shall appear that the number of senators is not justly proportioned to the several districts, that the legislature adjust the proportion, as near as may be, to the number of freeholders, qualified as aforesaid, in each district.  *  *  *  And be it ordained, that it shall be in the power of the future legislatures of this state, for the convenience and advantage of the good people thereof, to divide the same into such further and other counties and districts, as shall to them appear necessary."

In the section of the Constitution (Section 5) relating to assemblymen, after providing for the census, it further provides: "And if on such census it shall appear, that the number of representatives in assembly from the said counties is not justly proportioned to the number of electors in the said counties respectively, that the legislature do adjust and apportion the same by that rule."

The constitutional amendments of 1801 retained directions that senators and assemblymen should be apportioned "As nearly as may be according to the number of electors," but no further general limitations were placed upon the legislative power of apportionment.

By the Constitution of 1821 the state was divided into eight senate districts. It was therein further provided (Article I, section 6) that "An enumeration of the inhabitants of the state, shall be taken, under the direction of the legislature, in the year one thousand eight hundred and twenty-five, and at the end of every ten years thereafter; and the said districts shall be so altered by the legislature, at the first session after the return of every enumeration, that each senate district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens, paupers and persons of colour not taxed; and shall remain unaltered, until the return of another enumeration, and shall at all times consist of contiguous territory; and no county shall be divided in the formation of a senate district."

By the Constitution of 1846 the state was divided into thirty-two senate districts to correspond with the number of

senators to be elected.   And it was therein further provided
(Art. 3, sec. 4) that "An enumeration of the inhabitants of
the state shall be taken, under the direction of the legislature,
in the year one thousand eight hundred and fifty-five, and at
the end of every ten years thereafter ; and the said districts
shall be so altered by the legislature, at the first session after
the return of every enumeration, that each senate district shall
contain, as nearly as may be, an equal number of inhabitants,
excluding aliens, and persons of color not taxed ; and shall
remain unaltered until the return of another enumeration, and
shall at all times consist of contiguous territory ; and no
county shall be divided in the formation of a senate district,
except such county shall be equitably entitled to two or more
senators."

The Constitution adopted November 6, 1894, divided the
state into fifty districts and it further provided by article 3,
section 4, as follows :

"An enumeration of the inhabitants of the State shall be
taken under the direction of the Secretary of State during the
months of May and June, in the year one thousand nine hun-
dred and five, and in the same months every tenth year there-
after ; and the said districts shall be so altered . by the Legis-
lature at the first regular session after the return of every
enumeration, that each senate district shall contain as nearly
as may be an equal number of inhabitants, excluding aliens,
and be in as compact form as practicable, and shall remain
unaltered until the return of another enumeration, and shall
at all times, consist of contiguous territory, and no county shall
be divided in the formation of a senate district except to
make two or more senate districts wholly in such county.   No
town, and no block in a city inclosed by streets or public
ways, shall be divided in the formation of senate districts ;
nor shall any district contain a greater excess in population
over an adjoining district in the same county, than the popu-
lation of a town or block therein adjoining such district.
Counties, towns or blocks which, from their location may be
included in either of two districts, shall be so placed as to

make said districts most nearly equal in number of inhabitants, excluding aliens.

" No county shall have four or more senators unless it shall have a full ratio for each senator. No county shall have more than one-third of all the senators ; and no two counties or the territory thereof as now organized, which are adjoining counties, or which are separated only by public waters, shall have more than one-half of all the senators.  \*   \*   \*."

In· a true representative government every person should be equally represented in its legislative bodies. Exact representation requires that every senator and every assemblyman shall represent the same number of people. The maintenance of county, town and block lines and other practical considerations, recognized by and provided for in the Constitution, makes mathematical exactness in the division of the state into senate and assembly districts impossible. Because of the necessity of slight variations in the number of inhabitants in districts formed in accordance with the directions of the Constitution, it has always provided in substance for a division as ·nearly as may be in accordance with the number of inhabitants. The quotations that we have made from our first Constitution,· and from the subsequent amendments thereto and changes therein, show that equal representation in proportion to population has been the cardinal and underlying principle to which it has always pointed in directing and authorizing the legislature to reapportion the state.

The direction to the legislature that the senators be apportioned " as near as may be to the number of freeholders " is the only limitation on the power of apportionment contained in the first Constitution and the amendment of 1801. The very purpose of a decennial census provided for in the several Constitutions of the state has been to adjust differences in population which arise from changes in places of abode or increase in the number of inhabitants, and thus from time to time to make representation in the legislature more nearly ideal.

By the second Constitution of 1821 a new limitation was

placed upon the power of the legislature in the matter of apportionment by which it is provided that senatorial districts "shall at all times consist of contiguous territory." Substantially the same limitations were included in the third Constitution of 1846. Prior to the constitutional convention of 1894 much controversy had arisen in the state about the possibility of unfair divisions of the state into senate and assembly districts, so as to result in party or individual advantage. The apportionment of 1879 (Laws of 1879, chap. 208) was criticized; the enumeration of the inhabitants provided for in 1885 was delayed; and the apportionment of the state in 1892 (Laws of 1892, chapter 397), which was carried by vote of a majority of the legislature representing a different political party than the majority in 1879, was also criticized, and the act was challenged in the courts as not being in accordance with the letter and spirit of the Constitution. At least three proceedings were commenced which had for their purpose a judicial determination of the constitutionality of the act of 1892. The decisions in the General Term of the Supreme Court in such proceedings were conflicting. From orders in each of the proceedings an appeal was taken to this court and the decisions are reported under the title of *People ex rel. Carter* v. *Rice* (*supra*), in which case the question before the court was summed up in the prevailing opinion in these words, "The sole question now is whether the legislative discretion has been so far abused as to render the act liable to an overthrow by the courts." The conclusion of a majority of the court was that the "Act of 1892 successfully withstands all assaults upon it and is a valid and effective law." A dissenting opinion by Judge ANDREWS was concurred in by Judge FINCH. Thereafter and before the constitutional convention of 1894 another proceeding came before this court (*Matter of Baird* v. *Supervisors, supra*) and it was held that the division of the county of Kings into assembly districts had been made in disregard of the principles of equal representation and contrary to the Constitution. The decision in the *Baird* case was an exercise of jurisdiction by

this court and a determination that the constitutional provisions in regard to equality of representation had been disobeyed, although section 5 of article 3 of the Constitution at that time, as amended by a vote of the people November 3, 1874, provided for a division of the "respective counties into assembly districts each of which districts shall consist of *convenient* and contiguous territory."

In Lincoln's Constitutional History of New York (Volume 3, page 135) he calls attention to the opening address of the president of the convention, and commenting thereon he says: "The subject was doubtless given this precedence both on account of its intrinsic importance and also because of the unsatisfactory results of the apportionment of 1892 and the evident necessity of formulating rules which would prevent a repetition of inequitable apportionments and insure proportionate representation of population according to strict mathematical computation so far as consistent with other rules of limitation based on specified territorial divisions."

Referring again to the apportionment of 1892 he says (page 203): "Like many other events which have been noticed in these studies, it was a history-making statute and was the immediate occasion of important constitutional changes."

Again he says (page 218): "The apportionment of 1892 was frequently referred to in the course of the debate. Its inequalities and the possibilities under the existing Constitution, as shown by a decision in the *Carter Case* (135 N. Y. 473), were considered a sufficient reason for including in the Constitution rules which would make impossible a repetition of that statute."

These statements are fully justified by a perusal of the proceedings of the convention relating to the subject of apportionment, to which proceedings we can look when judicially construing the Constitution. (*People ex rel. Henderson* v. *Supervisors of Westchester Co.,* 147 N. Y. 1; *Matter of Keymer,* 148 N. Y. 219.)

This court, in *Matter of Smith* v. *Board of Supervisors, St. Lawrence Co.* (148 N. Y. 187), said: "The evil sought to be

remedied by the new Constitution was to prevent those gross discrepancies in apportionment and representation that had long been a public scandal and a reproach to the good name of the state." With that end in view, the Constitution of 1894 includes the following mandatory provisions in regard to senate districts :

1. Shall at all times consist of contiguous territory.

2. No county shall be divided in the formation of a senate district except to make two or more senate districts wholly in such county.

3. No town and no block in a city inclosed by streets or public ways shall be divided in the formation of senate districts.

4. Nor shall any district contain a greater excess in population over an adjoining district in the same county than the population of a town or block therein adjoining such district.

5. No county shall have four or more senators unless it shall have full ratio for each senator.

6. No county shall have more than one-third of all the senators.

7. No two counties or the territory thereof as now organized, which are adjoining counties or which are separated only by public waters, shall have more than one-half of all the senators.

In addition to these mandatory provisions it directs :

1. Each senate district shall contain, as nearly as may be, an *equal number* of inhabitants, excluding aliens.

2. Be in as compact form as practicable.

3. Counties, towns or blocks which, from their location, may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants, excluding aliens. (*Matter of Smith* v. *Board of Supervisors, St. Lawrence Co.*, 148 N. Y. 187, 193.)

In view of these limitations this court, in *In re Smith* v. *Board of Supervisors* (*supra*), said : "We feel assured that the People of the state can never again be subjected to those inequalities of apportionment and representation which gave rise to some of the present constitutional provisions so long as

the maximum excess in the population of the district is limited by mandatory provision to the population of a town adjoining such assembly district and the discretion exercised within that narrow limit is subject to the supervision of the courts." These words were used with reference to a division of counties into assembly districts.

Can it be doubted that in view of the history of constitutional changes in regard to legislative apportionment which shows a gradual withdrawal from the legislature of discretionary power and a continued adding of limitations upon their power relating thereto, and in view of the clear intention of the constitutional convention of 1894 and of the People in adopting the Constitution that this court should now hold that the minimum of discretion necessary to preserve county and other lines and to give reasonable consideration to the other provisions of the Constitution, is left to the legislature?

As the discretion of the legislature relating to the relative number of inhabitants in senate districts arises from necessity it should cease where the necessity for discretion ends. In the section of the Constitution relating to assemblymen (Article 3, section 5) it is provided that in any county entitled to more than one member of assembly the board of supervisors and in any city embracing an entire county and having no board of supervisors, the common council, shall "Divide such counties into assembly districts as nearly equal in number of inhabitants, excluding aliens, as may be, of *convenient* and contiguous territory in as compact form as practicable."

The word "convenient" is omitted in directing the legislature in regard to a division of the state into senate districts. We must assume that it was intentionally omitted. (*Roosevelt* v. *Godard*, 52 Barb. 533.)

Every provision of the Constitution which allows any discretion by the legislature, in apportionment must to some extent be affected and controlled by every other provision of the Constitution, but in the division of the state into senate districts matters of mere convenience and individual taste are not subjects for consideration.

While we recognize the binding force of the *Carter* case as applied to the facts then before the court, and in the construction of the Constitution as it then existed, we are of the opinion that the Constitution as it now exists should be construed so as to require that the legislature in dividing the state into senate districts make as close an approximation to exactness in number of inhabitants as reasonably possible in view of the other constitutional provisions, and that such approximation is the limit of legislative discretion.

In construing the language of the Constitution as in construing the language of a statute, the courts should look for the intention of the People and give to the language used its ordinary meaning. The ordinary and plain meaning of the words "contiguous territory" is not territory near by, in the neighborhood or locality of, but territory touching, adjoining and connected, as distinguished from territory separated by other territory.

Richmond county is not contiguous to Queens county within the meaning of contiguous as thus defined. Although Richmond county by its statutory boundaries adjoins the county of Kings, the latter county by its statutory boundaries intervenes between the county of Richmond and the county of Queens. Richmond county, never having had a population sufficient to entitle it to a senator, has by reason of its insular situation been peculiarly situated. The People, by Constitution and by acts of the legislature, have treated it as an exception to the mandatory provision of the Constitution in regard to contiguity, and because it has been necessary it has been joined in senate districts with counties whose actual and statutory boundaries do not touch or adjoin it.

The mandatory provision in regard to contiguity of territory comprising a senate district has been in the Constitution since 1821. By the Constitution of 1846 the county of Richmond was joined with the counties of Suffolk and Queens to constitute the first senate district. By chapter 339 of the Laws of 1857, by which the senate districts of the state were changed by the legislature, said counties were joined to con-

stitute the first senate district. By chapter 805 of the Laws of 1866 the legislature again joined these counties to make the first senate district. Although in 1879 Richmond county was joined with a part of the county of New York and in 1892 with a part of the county of Kings, the Constitution of 1894 joined the counties of Richmond and Suffolk to make the first senate district. By reason of a new constitutional provision the county of Richmond cannot now be joined to a part of either New York or Kings counties to make a senate district. In view of the construction placed on the Constitution by constitutional and legislative provisions, it should be held that the county of Richmond is exempt from the constitutional provision requiring that senate districts be composed of contiguous territory. The exception, however, should not be made more general than is required from the constitutional and legislative precedents. It nowhere appears by the Constitution of 1846 or 1894 that it was intended that the county of Richmond should be so generally exempt from its provision in regard to contiguity of territory that it could be by statute joined with any of the other counties of the state to make a senate district. The absurdity of joining Richmond county with some of the interior counties of the state to make a senate district is apparent upon a mere suggestion of such possibility. It should not be joined with a county other than one like itself bounded on the Atlantic ocean or with a county bounded on the Hudson river which is sufficiently near to Richmond county so that a senate district so formed would be as far as possible within the letter and spirit of the constitutional provision requiring that senate districts shall " be in as compact form as practicable."

We do not think that the legislature violated the mandatory provision of the Constitution relating to contiguity of territory by joining the county of Richmond with the county of Queens.

The citizen population of the state as shown by the enumeration of 1905 was 7,062,988. Dividing this number by 50, as provided by the Constitution, gives a ratio of 141,259

for apportioning senators. With such ratio it appears that
the county of New York was entitled to 12 senators; the
county of Kings to 8, and the county of Erie to 3, in which
counties the average citizen population to a district would be
respectively 150,024, 147,347 and 146,192, and the county
of Kings was entitled to one senator more than the number
specifically provided therefor by the Constitution as adopted
in 1894, and under the new constitutional provision it
increased the full number of senators in the state from 50 to
51. Deducting from the entire citizen population of the
state the citizen population of the counties of New York,
Kings and Erie, there remains a citizen population in the
other counties of the state of 3,645,337, which divided by 28,
the number of senators outside of the counties of New York,
Kings and Erie, gives a ratio for each senatorial district of
130,190. The counties other than New York, Kings and
Erie having a citizen population in excess of the ratio for
apportioning senators are Queens, Westchester, Albany, Rens-
selaer, Oneida, Onondaga and Monroe. Each of these coun-
ties having a citizen population in excess of the ratio is enti-
tled by any just and reasonable construction of the Consti-
tution to at least one senator. (*State ex rel. Atty.-Gen.*
v. *Cunningham,* 81 Wis. 440; *Parker* v. *State,* 133 Ind.
178.)

The minimum rights of such counties were determined by
the enumeration and they could not be taken away by an
exercise of discretion by the legislature at least unless the
geographical position of some small county was such as to
make it absolutely necessary that it be joined with some one
of such counties. No such absolute necessity required that
Richmond county be joined to Queens county or to any other
county having its full ratio. Joining Richmond county to
Queens county to make the second senatorial district was
an exercise by the legislature of arbitrary power not author-
ized by the Constitution. If Richmond county should be
joined to Nassau county it would not make a citizen popula-

tion equal to the ratio, and even if the peculiar position of those island counties would allow the legislature in its discretion to join the counties of Richmond, Nassau and Suffolk in one senate district the combined citizen population of such counties would be but 203,616. The relative citizen population of the first and second senate districts as provided by the act is 137,175 to 246,187, and between the first and second districts, if the first was composed of the three counties stated and the second of Queens county alone, would be 203,616 to 179,746 or a difference in favor of equality between the first and second senatorial districts of 85,142. The rights of Queens county under the Constitution because of its having a citizen population above the ratio and also by reason of inequalities in the number of citizens in the first and second senate districts required that Queens county be given a senator without joining with it any other county.

A reference to the diagram will show how grossly the provision of the Constitution in regard to compactness has been violated in the thirteenth senatorial district which is within the county of New York. All of the territory of the county of New York comprising that portion of Manhattan island shown on the diagram is comparatively level and fully covered by blocks bounded by streets on which blocks buildings have been erected for business or residential purposes, and no possible purpose for the exercise of discretion to make a district that is not reasonably compact has been shown, and no effort whatever seems to have been made to make the district mentioned in as compact form as practicable.

The reasons alleged for the rambling territory comprising the thirteenth senate district with its boundaries of many sides and various angles are wholly immaterial and not recognized by the Constitution in the apportionment of senate districts. A reference to the boundaries of the senate districts in said county as made by the constitutional convention shows that the county can be divided into districts which are reasonably compact, each having comparatively few sides and angles. Within the limits of a city entitled to many senators the

requirements for compactness would seem to exclude all possibility of a district in the shape of the thirteenth senatorial district as shown on the diagram. (*In re Timmerman,* 100 N. Y. Supp. 57.)

The disregard of constitutional provisions in forming the second and thirteenth senate districts is clear, and they so affect the entire apportionment as to make it necessary to declare the act wholly unconstitutional and void. It is not necessary or wise to discuss the provisions of the act relating to other senate districts except to say that differences arising from necessity and slight differences in the citizen population of senate districts and the relative weight of slight differences in population in comparison with considerations of compactness or the reverse, upon which men of judgment and discretion may fairly differ, are matters belonging distinctly to the legislature and not to the judicial branch of the government, and with which this court has no disposition or jurisdiction to interfere.

Every apportionment must stand upon its own particular facts. The rules and principles which we have stated are general, and result from an examination of the Constitution and a study of its development. They are applied to the facts on this appeal so far as stated and only so far as stated.

It is difficult and perhaps impossible to state rules by which future apportionments can be measured. This court has already said by Peckham, J., in *Matter of Baird* v. *Supervisors (supra),* that " We have no trouble whatever in detecting the difference between noon and midnight, but the exact line of separation between the dusk of evening and the darkness of advancing night is not so easily drawn." (See *People ex rel. Schau* v. *McWilliams,* 185 N. Y. 92, 100.)

I concur in the views expressed by Cullen, Ch. J., as to the effect of the acts of a *de facto* legislature so long as its members remain actual incumbents of their offices respectively.

The orders should be reversed, with costs to appellants in all courts, but as since the institution of the proceedings the several respondents have gone out of office and the election

itself has been held, no order should be made directing the issue of a writ of mandamus.

CULLEN, Ch. J.   In reaching the conclusion which we have announced in the opinion of Judge CHASE, we have not by any means failed to fully weigh and consider the results that may follow from our decision.   While our supreme duty is to enforce the provisions of the Constitution, upon which, as a foundation, the whole fabric of the government of this state rests, we fully appreciate that government is or should be pre-eminently a practical thing and that courts should long hesitate to throw the government into confusion and disorder by declaring an act of the legislature invalid, and so declare only when the violation of the constitutional mandate is clear and certain.   That the violation of the Constitution is too plain to be disregarded is the conclusion to which we have been forced by the reasons stated by my brother CHASE; but at the same time we think it not only proper but our duty to say that in our opinion the fear that our decision may throw the government of the state into confusion is unfounded. When this appeal was before us immediately prior to the general election last year, in dismissing that appeal we unanimously said that whether the Apportionment Act of 1906 was constitutional or not, the legislature which might be actually chosen by the electors of the state under that apportionment would be a *de facto* legislature, whose acts would, in all respects, be binding.   To that declaration we still adhere, and we understand no one to gainsay it.   It is now, however, suggested that when our decision that the Apportionment Act is unconstitutional is announced, from that time the present legislature will no longer be a *de facto* body. This suggestion is without force either in principle or under the authorities.   An act of the legistature if invalid, as violating the Constitution, is invalid from the time of its enactment, not merely from the declaration of its character by the courts.   But though the appointment or election of a public officer may be illegal, it is elementary law that his official acts

while he is an actual incumbent of the office are valid and binding on the public and on third parties. (2 Kent's Comm. 295; *People ex rel. Bush* v. *Collins*, 7 Johns. 549; *Wilcox* v. *Smith*, 5 Wend. 231; *People ex rel. Sinkler* v. *Terry*, 108 N. Y. 1; *State* v. *Carroll*, 38 Conn. 449.) In the case last cited there is one of the best expositions of the doctrine of *de facto* officers to be found in the reports. The doctrine is not one of convenience merely but of necessity. In *State ex rel. Knowlton* v. *Williams* (5 Wis. 308) it was contended that a statute of the state was invalid because approved by a governor whom the courts subsequently declared not to be entitled to the office. Nevertheless, it was held that as the statute was approved by an actual incumbent of the office of governor, it was in all respects valid and effective. Of course, an officer who, though *de facto*, is not such *de jure*, may be ousted from the office he illegally holds by proceedings instituted to try his title to the office, and when adjudged a usurper he ceases from that time to be an officer *de facto*. But to have this effect the judgment must be rendered in a proceeding to oust him from office; it is not sufficient for the purpose that his title to office be declared bad in a collateral proceeding. A notable example of this principle is the case of *People ex rel. Smith* v. *Schiellein* (95 N. Y. 124), which was an application for mandamus against the town board of New Lots to canvass the vote and award a certificate to the relator, who claimed to have been elected a justice of the peace at the town meeting. The right of the relator depended on his claim that a statute directing justices of the peace of the town of New Lots to be chosen at the general election was unconstitutional and void, and so the courts held. It happened, however, that one of the defendants in the proceeding was a justice of the peace elected and holding office under the very statute declared invalid. He insisted that if the statute was invalid he was not a justice of the peace nor a member of the town board, and, therefore, the writ should not run against him. This court overruled the objection, saying it was sufficient that Watson, the defendant, who raised the objection, was actually

in office, and it also said that the decision in the mandamus suit of itself did not oust him. Judge RUGER wrote for the court: "It may be that one of the results following the determination of this appeal will be his removal from office, but that will not be the direct result of our adjudication. Title to his office is not triable in this proceeding and, therefore, cannot be here adjudicated." It was, therefore, entirely possible that had no proceedings been taken against Watson, or had he not voluntarily relinquished office, he might have remained therein despite the adverse decision of the court, and his acts would have been valid. The position of the members of the present legislature is much stronger. The proceeding before us is not to try the title of any member of the legislature to his office, but against certain administrative officers as to the conduct of an election. Therefore, were it possible for the courts to try the title of members of the legislature this decision would not directly affect that title. But, under the Constitution, each house of the legislature is the exclusive judge of the election and qualification of members. The courts have no jurisdiction to determine the title of any member. In the case of *People ex rel. Sherwood* v. *State Board of Canvassers* (129 N. Y. 360) by a divided court it was held that the relator being disqualified under the Constitution from election as a senator the courts would not compel a board of canvassers to give a certificate of his election, but even the majority opinion conceded that the ruling of the court would in no way bind the senate, when convened, on the question of the relator's rights. As already said, the senate and assembly elected under the Apportionment Act and actually assembled constitute in any aspect a *de facto* legislature. As a *de facto* body each house has, under the Constitution, not only the exclusive power but the exclusive right to judge of the title of any of its members to a seat therein. Whoever either house receives as its legally elected member and entitled to a seat becomes thereby a *de jure* member of that house, even though the courts, were such a question triable before them, might be of a different opinion.

It follows, therefore, that not only is the present legislature a valid legislature, but that each member thereof, so long as the particular house to which he belongs does not oust him, is as to all the world not only a *de facto* but a *de jure* member, and is entitled to all the privileges of a member, the exemption of his person, the right to his salary and the like, and his title to office cannot be challenged before any tribunal except the house itself. Thus there can be no vacancy in any particular district which the governor or other officer can call upon the electors to fill, unless the house ousts the member and declares him not entitled to his seat. All this, however, does not show that our decision is a mere *brutum fulmen* and of no practical effect. While the court cannot pass on the title of any present member of the legislature, it can control the action of administrative officers in the conduct of the next election that takes place. If the present legislature should pass a new apportionment bill in compliance with the provisions of the Constitution, the next general election at which members of either house are to be elected will be held under the new statute. If the legislature fails to discharge this duty, then the election must be held in accordance with the apportionment under the Constitution of 1895. In other words, while the courts cannot interfere with the present legislature, they can compel future elections to be held in compliance with the Constitution.

GRAY, J. I should hesitate to agree with the opinion of my brother CHASE, as to the unconstitutionality of the Apportionment Act, if I were not convinced that the amendment of the State Constitution, in 1894, had materially changed the rules, which should govern the apportionment by the legislature of the representatives of the citizens of the State.

In the case of *People ex rel. Carter* v. *Rice*, (135 N. Y. 473), which involved the Apportionment Act of 1892 and in the decision of which I took part, I was of the opinion that the then existing constitutional provision vested a certain discretion in the legislative body in exercising its power, with

which the court should not interfere; when there had been neither a flagrant disregard, nor an unmistakable violation, of the constitutional injunction that the apportionment should be " as nearly as may be " according to the number of citizens.

As may be discovered from the debates in the constitutional convention of 1894, the decision in the *Rice* case moved that body to recommend new provisions, or rules, for an apportionment. They were intended to remedy whatever defectiveness in the old rules made possible the inequalities, observed in the preceding apportionment act.

It is of great significance and it, necessarily, has a most important bearing upon the attitude of the court towards the legislative action, that the article of the Constitution, (Art. III, sec. 5), expressly provides for a judicial review of any apportionment by the legislature. The legislature, now, exercises its power subject to a review by the court of its act, which any citizen may invoke. The article, in its present form, as Judge CHASE well points out, reduces the discretionary power of the legislature to a minimum. The limitations upon its exercise are relaxed, practically, only with respect to the preservation of county, town and block lines. It is the intention of the People of the State, as declared by the recent amendment of the article of the Constitution, that, in the apportionment of districts, there shall be as near to an exact equality in the number of inhabitants, as is possible from a consideration of nothing else than the constitutional provisions upon the subject; that the districts shall consist of contiguous territory; that they shall be in as compact form as possible and that divisions of counties, towns or blocks shall only be made in the cases specified. It was to insure that such an apportionment should be governed by no considerations of convenience, nor rest in a large political discretion, that a review by the court was expressly provided for. That has been made mandatory, which before was discretionary. In my opinion, before this amendment of the Constitution, it was a grave and a doubtful question whether, in the absence of a gross and plain violation of the Constitution, the court was justified in interfering with

the execution by the legislative department of the government of its duty of apportionment. But, by the amendment, the matter is placed upon a different basis and the duty is devolved upon the court to review an apportionment, when complained of, and, thereby, to enforce the constitutional mandates as they are expressed.

For these reasons, I shall concur with Judge CHASE's opinion that this Apportionment Act is violative of the constitutional provisions.

I am, also, in agreement with the Chief Judge that no serious, or real, embarrassment can arise with respect to governmental, or legislative, acts. However the lay mind may apprehend confusion as the result of our decision, the legal situation, in my opinion, is clear and is correctly stated by Judge CULLEN.

HAIGHT, J. (dissenting). While it has been held that the courts have the power to review the acts of the legislature in apportioning senatorial districts for the purpose of determining whether such acts are in compliance with the requirements of the Constitution, it has been the subject of considerable discussion as to how, or when, the question can be raised, and as to the extent of the power that should be exercised by the court in such review. It was, doubtless, because of such discussion and uncertainty that a new provision was inserted in the Constitution of 1894, which provides as follows: "An apportionment by the legislature, or other body, shall be subject to review by the Supreme Court, at the suit of any citizen, under such reasonable regulations as the legislature may prescribe; and any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same." (Art. 3, § 5.) Unfortunately, the legislature has not, as yet, adopted any regulations or prescribed the practice that should be followed in such a review. I, however, am of the opinion that the provision is self-executing, and, in the absence

of legislation providing a practice to be followed, the courts will adopt such practice as will secure to all parties their rights to the review provided for.   It will be observed that the door has been thrown wide open, and any citizen of the state is given the right to have a review.   It is " at the suit of any citizen."   The word " suit," as defined by Bouvier, is of comprehensive signification, and applies to any proceeding in a court of justice in which a person pursues a remedy which the law affords him for the redress of an injury or the recovery of a right.   It includes both actions and proceedings.   "At the suit of any citizen " may be by a proceeding, and the practice to be adopted should be of the simplest form.   Any citizen, therefore, may move the court upon a petition or affidavit setting forth the grounds upon which he claims that the Apportionment Act violates the provisions of the Constitution, upon such notice as the court may require, which, doubtless, should be served upon the attorney-general and possibly the presiding officers of the two branches of the legislature, and thereupon, the court, before which the motion may be pending, must give precedence thereto over all other causes and proceedings, and if not in session it shall promptly convene and dispose of the same.   I entertain the view that this provision of the Constitution was intended to give to every citizen of the state, who so desired, an opportunity to review the constitutionality of an apportionment act, and that the citizen first instituting the proceeding gives the court jurisdiction, and all other citizens desiring to move should come in and join with him, so that there may be one determination of the question, which will be final and conclusive upon all persons, and that the remedy thus given takes the place of and is exclusive of all other remedies for review which may have heretofore existed.   Otherwise the door must remain open for any citizen, at any time during the ten years for which the apportionment runs, to bring up for review questions which may arise in different parts of the state with reference to the validity of the act, thus involving in doubt the *de jure* existence of every legislature that may

be elected by the people.  Under the Constitution and the statutes senatorial districts are required to be divided into assembly districts and assembly districts into election districts. This is followed by our primary and general .election laws providing for the nominations of candidates and the manner of their election.  A statute is presumed to be valid until its invalidity is adjudged by a court having jurisdiction so to do. If it is adjudged to be violative of the provisions of the Constitution, the previous existing law remains as if the statute had not been passed.  In this case the effect would be to restore the senatorial and assembly districts as they previously existed.  (*People ex rel. Farrington* v. *Mensching*, 187 N. Y. 8.)

Under the new Apportionment Act sixteen of the old senatorial districts remain unchanged.  The remaining thirty-four districts are divided and united with other territory.  By restoring the old districts it would follow that sixteen senatorial districts only would be represented in the present senate and the other thirty-four districts would not be represented ; and that in the assembly the only *de jure* members would be those who represent the old districts which have remained unchanged.  In that event we should be confronted with questions of grave importance which ought not to be determined by dictum or without the aid of argument, as to whether vacancies would exist in the unrepresented districts and whether it would be the duty of the governor to issue his proclamation calling special elections in such districts ; or whether the present legislature, being a *de facto* body, could continue its existence during the time for which the individual members composing it were elected, notwithstanding the fact that they were elected to represent districts which were created in violation of the Constitution.  It can readily be seen that such a situation would not only disarrange the machinery of the legislative branch of the government, but would create confusion and chaos in all of the other branches thereof dependent thereon ; as was said by PECK-HAM, J., in the case of *People ex rel. Carter* v. *Rice* (135

N. Y. 473) : " What is the result which would follow? In the first place we should have every enumeration and every apportionment act brought before the courts for review, and as it would not be necessary to act immediately any citizen, at any time during the running of the decennial period, would have the right to invoke the aid of the court to set aside as void any such act and leave the People to suddenly confront such a situation as is now presented. This, in itself, is sufficient to induce a court to say that only in a case of plain and gross violation of the spirit and letter of the Constitution should such a power be exercised. * * * The greatest confusion and disorder would result from a holding that this act is invalid. Whether any members of assembly could actually be elected under another law at this late day is quite problematical. The spectacle of a legislature elected under an unconstitutional law or part of the members elected under it and part under another, is one which ought not to be contemplated without the greatest anxiety by all honest citizens." I have thus called attention to the situation that confronts us for the purpose of aiding us in determining the meaning of the new provision of the Constitution under consideration as to the time when the proceeding should be instituted. As we have seen any citizen may institute the proceeding. The time within which the proceeding is to be instituted is not specifically stated, but the court is required to give the case precedence over all other causes, and if it is not in session it shall convene promptly and dispose of the same. If a citizen may take his own time for instituting the proceedings the command of the Constitution for a speedy determination by the courts would seem to be unnecessary. To my mind, the spirit and intent are apparent. If the court is to act speedily the suitor should also. While the door is thrown open to every citizen to institute the proceeding, he must act promptly so that the questions raised by him may be speedily determined and thus avoid the annulment of the other proceedings required by the Constitution and the statute with reference to the division of senatorial districts into assembly districts and other acts, and

proceedings dependent thereon and prevent the disarrangement of the machinery of the government and the confusion and chaos that are liable to follow. The Apportionment Act became a law on the 14th day of May, 1906. The first proceeding that was instituted to have it annulled was commenced on the 27th day of July thereafter. The first appeal taken to this court is dated December 6, 1906, long after the division of the senatorial districts into assembly districts and their division into election districts and after the election of senators and assemblymen had been made thereunder. This delay was through no fault of the courts. Each court assembled speedily and at once determined the question presented to it. It is true that in this court upon the former appeals taken the orders appealed from were found not to be in form to give us jurisdiction to review; but this fact should not operate to relieve the moving parties from the situation now confronting us, which is the result of their own fault. I, therefore, favor dismissal of the proceedings upon the ground of laches.

Werner, J. (dissenting). This court is about to annul an act of the legislature (Laws 1906, chap. 431) apportioning the state into fifty-one senate districts, and fixing the number of assemblymen to be elected in each county of the state. Against that decision I desire to record my dissent, because I deem it unnecessary in fact and unwarranted in law. Of the fifty-one senate districts into which the state has been divided, two have been selected by this court as presenting such inherent and controlling elements of invalidity as to justify the demolition of the whole of the existing legislative structure. It needs no argument that to avert such a consummation, with its inevitable train of confusion and uncertainty, the judicial department as one of the co-ordinate branches of the government should invoke every means within its power. As briefly as possible I shall attempt to convince my associates that the apportionment of 1906 was a valid exercise of legislative power, both as regards the element of legislative discretion and compliance with constitutional mandates. In this effort

I shall not go into the constitutional history of the state, for that has been most admirably done by my brother CHASE, but will confine the discussion to those questions of immediate and practical importance that arise out of the Constitution of 1894 and the Apportionment Act of 1906.

The Constitution provides that "An enumeration of the inhabitants of the State shall be taken under the direction of the Secretary of State, during the months of May and June, in the year one thousand nine hundred and five, and in the same months every tenth year thereafter; and the said districts shall be so altered by the Legislature at the first regular session after the return of every enumeration, that each senate district shall contain as nearly as may be an equal number of inhabitants, excluding aliens, and be in as compact form as practicable, and shall remain unaltered until the return of another enumeration, and shall at all times, consist of contiguous territory, and no county shall be divided in the formation of a senate district except to make two or more senate districts wholly in such county. No town, and no block in a city inclosed by streets or public ways, shall be divided in the formation of senate districts; nor shall any district contain a greater excess in population over an adjoining district in the same county, than the population of a town or block therein adjoining such district. Counties, towns or blocks which, from their location, may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants, excluding aliens.

"No county shall have four or more senators unless it shall have a full ratio for each senator. No county shall have more than one-third of all the senators; and no two counties or the territory thereof as now organized, which are adjoining counties, or which are separated only by public waters, shall have more than one-half of all the senators." (Art. 3, sec. 4.)

It will be noted that this section of the Constitution imposes upon the legislature seven limitations in the making of an apportionment, four of which are mandatory and imperative, and three of which are coupled with discretionary pow-

ers.  The mandatory limitations are (1) that senate districts "shall at all times consist of contiguous territory;" (2) that "no county shall be divided in the formation of a senate district except to make two or more senate districts wholly in such county;" (3) that "no town and no block in a city inclosed by streets or public ways shall be divided in the formation of senate districts;" (4) that no district shall "contain a greater excess in population over an adjoining district in the same county, than the population of a town or block therein adjoining such district."  The discretionary limitations are, (1) "each senate district shall contain as *nearly as may be* an equal number of inhabitants, excluding aliens;" (2) "and be in as compact form as practicable;" (3) "counties, towns and blocks which, from their location, may be included in either of two districts, shall be so placed as to make said districts *most nearly equal* in number of inhabitants, excluding aliens."

Pursuant to the above-quoted constitutional provisions an enumeration of the inhabitants of the state was made in the year 1905, and this was followed in 1906 by the enactment of the statute, colloquially referred to as the Apportionment Law, by which the state was divided into fifty-one senate districts, and the number of assemblymen was fixed at one hundred and fifty to be apportioned among as many districts to be created by the several boards of supervisors of the counties of the state.

Under the enumeration of 1905 the citizen population of the state was 7,062,988 which, divided by 50 as directed by the Constitution, gives a ratio of 141,259 upon which to apportion senate districts.  This simple sum in arithmetic revealed the cogent and immutable fact that at least twenty-three of the fifty-one senators must be allotted to the counties of New York, Kings and Erie, leaving but twenty-eight senate districts for all the rest of the state.  After deducting from the total citizen population of the state that portion which was centered in the counties of New York, Kings and Erie, there was left for the other counties a total of 3,645,337

which, when divided by twenty eight, made a ratio of 130,190 for each of twenty-eight senatorial districts to be erected in the territory extending from the Harlem to Lake Erie and from the St. Lawrence to the Pennsylvania line. Of these remaining twenty-eight districts at least nine are quite as arbitrarily fixed as the twenty-three in New York, Kings and Erie, either on account of population or geographical location. These are the districts composed of Monroe, Onondaga, Oneida, Rensselaer, Westchester, Chautauqua and Cattaraugus, Rockland and Orange, Orleans and Niagara. Thus there were really only nineteen districts the formation of which had not been practically prearranged by the express commands of the Constitution. A mere glance at the map of the state is sufficient to convince one that these districts must necessarily differ in varying degrees, in the character and number of inhabitants, configuration and topography of territory, defined avenues of travel, means of intercommunication, and legislative needs. When the apportionment of 1906 is studied in the light of these potential considerations, and of the four imperative constitutional limitations above adverted to, it seems to me to present to the judicial mind abundant reason for the differences in size, shape and population that characterize the districts which are not arbitrarily confined to the fifteen enumerated counties by the express commands of the Constitution. Since these general propositions are so obviously true as to remove them from the realm of dispute, they are alluded to only for the purpose of showing that in selecting for criticism the two particular senate districts upon which the fate of this appeal now depends, my brethren seem to have lost sight of some of the just and broad considerations that have been influential if not controlling factors in securing judicial approval of other districts no less vulnerable. These general observations sufficiently pave the way for the discussion of the two districts as to which we differ.

It is said that in the erection of the second senate district, composed of the counties of Queens and Richmond, the legis-

lature has violated several of the express commands of the Constitution, and has so palpably transcended the limits of legislative discretion as to compel the courts to declare the Apportionment Law invalid. It is true that in the creation of this district the legislature did not obey the constitutional mandate that each senate district " shall at all times consist of contiguous territory." And why ? Because compliance with that mandate was impossible. Richmond county, with a population of 66,441, is an island literally contiguous to no other territory in the state. It is practically contiguous to New York and Kings counties, but cannot be joined with either of them because the Constitution also provides that " no county shall be divided in the formation of a senate district except to make two or more senate districts wholly in such county." As the population of Richmond is scarcely more than one-half of the ratio which is the basis of the apportionment, it is obvious that the legislature adopted the only alternative in joining it to the territory most contiguous, which is the county of Queens. It is said that in joining together the counties of Queens and Richmond the legislature has violated that other constitutional requirement, " that each senate district shall contain as nearly as may be an equal number of inhabitants." The appellants call attention to the fact that, although the ratio is 130,190, the county of Queens has alone a population of 179,746, or an excess of 49,556, while the addition of Richmond gives the district a population of 246,187, which makes it the largest in the state and gives it an excess of 115,977 over the ratio. For the purpose of emphasizing the alleged legislative violation of the Constitution the appellants set these figures over against the 97,717 of population credited to the district composed of the counties of Wayne and Ontario, which is the smallest in the state. This is manifestly not a fair comparison. A scrutiny of the whole list of districts clearly discloses the varying inequalities in population caused by the effort of the legislature to observe, as nearly as possible, all the other conflicting constitutional requirements as to contiguity, com-

pactness and county lines. These inequalities, so far from evincing the legislative disregard of the constitutional command that equality of population shall be produced " as nearly as may be," are a demonstration of the necessity for compromises between co-ordinate and conflicting requirements of the Constitution. When we consider that twenty-three of the fifty-one senate districts must be assigned to three counties before there can be any attempt to apportion the rest of the state, and that another group of eleven counties must as inevitably be divided into nine of the districts now appearing upon the map as though they were specifically named in the Constitution, it becomes apparent that there were great difficulties in the division of this vast remaining domain, embracing nearly 50,000 square miles, into the remaining nineteen districts, which had to be erected with due regard, not merely to approximate equality of population, but in obedience to the other and even more positive commands of the Constitution. The smallest district as well as the largest one may have been fixed by conditions from which there was no escape. Two districts at opposite ends of the state, the one wholly urban and the other almost entirely rural, cannot fairly be compared to test the validity of either, for each may be hedged about by peculiar conditions which render it impossible to avoid inequality in population. This is well illustrated in the case of the Queens-Richmond district. The geographical location of Richmond county is such that, within the limitations of the Constitution, it cannot be joined to any territory except that on Long Island outside of Kings county. To say that it may be joined to Rockland, Putnam or any other of the so-called Hudson river counties, which are from twenty-five miles to forty miles distant, is to annihilate every constitutional command save that which relates to equality of population. Such a solution of the problem would be as unreasonable as unjust. When we turn from such an impossible alternative to the only possible one, namely, that of a union of Richmond with one or more of the Long Island counties outside of Kings, we perceive that it presents nothing more

than a choice of evils ; on the one hand, Nassau and Suffolk which, when joined to Richmond, would have a population of 203,616, or 73,426 above the ratio ; on the other hand, the Queens-Richmond district as now constituted with an excess of 115,997. It must be admitted that the difference of 42,571 is a very substantial one which, other things being equal, would be conclusive in favor of the Richmond-Nassau-Suffolk district, as against the Queens-Richmond district. But other things are not equal. Nassau and Suffolk counties are not as "contiguous" to Richmond as Queens. The two former are practically suburban counties, stretching along the shore of Long Island to a remote distance, while the two latter are distinctly urban, both being boroughs of the greater city and having an identity of interest that far outweighs the difference of a few thousand in population. These and other kindred considerations were probably influential in leading the legislature to decide upon the second district as it now stands. In *Matter of Smith* v. *Board of Supervisors, St. Lawrence Co.* (148 N. Y. 191) the petitioner urged that there should have been a transposition of two towns in St. Lawrence county, which were on the dividing line between two assembly districts, because that would have resulted in reducing the disparity in population from 716 to 144, or a gain in favor of equality amounting to 572. In the discussion in that case of the constitutional commands to the effect that assembly districts shall be as nearly equal in number of inhabitants as may be, and that they shall be of convenient and contiguous territory, in as compact form as practicable, this court clearly recognized the ample discretionary powers delegated to legislative bodies charged with the important duties of making apportionment. In speaking of those qualified clauses of the Constitution relating to equality of population and compactness, which not infrequently conflict with the unqualified clauses relating to contiguity of territory and the division of counties, towns and city blocks, this court said : " These qualifying words indicate the clear intention of the framers of the Constitution to permit the exercise of a reasonable and honest

discretion on the part of the supervisors, provided that in no case should there be a. greater excess in population over an adjoining district than the population of a town therein adjoining such assembly district. In the exercise of this discretion they are to lay out the districts so as to be of convenient and contiguous territory, in as compact form as possible."

In view of the unique physical situation of Richmond county, which renders impossible a literal compliance with all or any of the constitutional mandates relating to apportionment, I think it cannot fairly be said that a difference in population of 42,571 in favor of some other arrangement than that adopted by the legislature is sufficient to nullify the plan for the whole state. This is especially true when we consider the decision of this court in *People ex rel. Carter* v. *Rice* (135 N. Y. 482), where it was held that an inequality of 135,418 between two districts in New York city was not enough to condemn the apportionment then under review. That decision, moreover, was under the act of 1892, which was bitterly impugned for partisan unfairness, while the contest at bar, so far as appears, is entirely devoid of all partisan interest.

The validity of the apportionment is further assailed in so far as it relates to the thirteenth district, which is one of the districts in the borough of Manhattan in the city of New York, and the attack is made upon the ground that it is in violation of the constitutional mandate that senate districts shall " be in as compact form as practicable." This provision as to compactness was not in the Constitutions which preceded the one adopted in 1894, and has, therefore, not been the subject of judicial construction in our courts. The noun "compactness" is defined in the Century Dictionary as "the state or quality of being compact; firmness; close union of parts." The noun "form" is defined as "the external shape or configuration of a body; the figure as defined by lines and surfaces." These two definitions clearly disclose the possibility of confounding "form" and "compactness" in cases where there is reason for preserving the distinction between them.

To the ordinary observer a first glance at the map showing the thirteenth senatorial district would seem to suggest a plain absence of compactness when in fact it is nothing more than irregularity in form.   Close union of territory does not depend upon any particular shape.   In the physical world the most compact body is the complete sphere in which the center is at the same distance from every part of the surface.   Next in order of compactness, perhaps, would be the perfect square, and then the parallelogram.   For obvious reasons these arbitrary symbols cannot be applied to the demarkation of lands into political divisions.   The rarity with which they are even approximated is shown by every geographical map ever made. It is to be observed, moreover, that the command as to compactness is qualified by the test of practicability.   The senatorial districts shall " be in as compact form as *practicable*." In other words, they shall be as compact as feasible ; as compact as may be, within the bounds of actual execution as distinguished from theoretical discussion.   Compactness as applied to one situation may have a clear meaning that would be wholly inapplicable to a different situation.   It may be one thing as applied to the Adirondack region and quite another as to a tenement-house district in New York city.   I think it may also be fairly argued that the term " compact " as used in our Constitution has reference not merely to territorial compression, but to density of population and such considerations as convenience of access and unity of interest, as well as those constitutional limitations inhibiting the division of certain city blocks and enjoining the placing of others so as to produce the most approximate equality of population.   When the matter is viewed in the light of these suggestions, it seems to me that a court cannot pass upon the compactness of a given district without critically going over the entire territory of which it forms a part, so as to be able to see what effect a different subdivision would have upon the whole.   The most practical test of the question is to draw a rough sketch of an island of irregular shape and divide the interior into absolute squares each of which theoretically contains an equal number

of inhabitants excluding aliens.   The outer edge or fringe of
the island would, in the nature of things, have to be divided
into spaces of irregulaar shape, having a greater or lesser area
than the squares, and representing corresponding differences
in population.   By dividing the total population of the island
by the number of senate districts to be erected, the ratio for
each district would be obtained.   It will readily be seen that
even under such an arbitrary arrangement the senate districts
would necessarily have to be of irregular shapes and different
sizes, thus embracing varying numbers of the squares or irregu-
lar spaces.   The actual problem which confronted the legisla-
ture in the apportionment of Manhattan island was infinitely
more difficult than is the illustration given above, for the reason
that the population of the city blocks varies all the way from
a single inhabitant in some cases, to three thousand and
upwards in others, and when this situation is applied to the
constitutional inhibition against the division of city blocks, it
is apparent that in the effort to make districts " as compact as
practicable" the legislature must be given great latitude.
The question is not to be decided upon the form of one dis-
trict; nor as though the courts were a second legislature with
powers of revision.   It must be met upon the broad ground
that the courts shall not invoke the judicial power unless,
after giving due heed to every practical difficulty with which
the legislature has had to deal in the apportionment of a
whole state, they shall regard the legislative discretion as hav-
ing been so far transcended that annulment of the legislative
enactment is unavoidable.   The inability of courts to deal
satisfactorily with questions involving the exercise of legis-
lative discretion is very aptly expressed in *Smith* v. *Board
of Supervisors* (*supra*) in the following language :   " It is
quite impossible that the carving out of these districts with
a due regard to convenience, contiguity and compactness
could be accomplished in a satisfactory manner except by a
board of officers thoroughly familiar with the territory and
having an intimate knowledge of its towns, topography and
means of communication by land and water.   We should not

feel justified in interfering unless convinced that there had been a clear abuse of discretion."

It is only when we consider that there is a legal presump-tion that the law-making power has performed its duty in the enactment of this statute, and that if there is any doubt upon the subject it is the duty of our courts, as a co-ordinate branch of government, to resolve it in favor of the validity of the work of the legislature, that we can fully realize how utterly indefensible the creation of a particular district must be, in order to justify the judicial overthrow of the whole plan of apportionment. In this connection the language of the Supreme Court of Illinois in a similar proceeding is singularly apposite. "Absolute exactness in that respect is not attain-able. The requirement of contiguity of territory has been observed in every instance, but in the formation of one, at least, of the districts it might well have been urged in the General Assembly that the requirement of compactness had not been observed and complied with as fully, fairly and justly as might be done, and that a nearer approximation to compact-ness was attainable. How much nearer an approximation to compactness might have been made in this district could not, necessarily, be determined in view, alone, of the territory of that district and of the other districts adjoining it, but possibly only upon a view of all the districts of the state. A change in that district might have made necessary a readjustment of the entire apportionment, and this involved the exercise of judg-ment and discretion of the law-making body." (*People ex rel. Heffernan* v. *Carlock*, 198 Ill. 150.) The only possible difference between the situation described in the case just cited and that in the case at bar, is that our legislature could have re-arranged the districts of New York city without affecting the districts in the state at large. Our courts, however, cannot do that. They must either support the whole structure or destroy it absolutely. Taking into account all the various elements that enter into a practical scheme of apportionment, I do not believe the courts should annul this act of 1906 because it is thought that the outlines of a particular dis-

trict indicate that it is not as compact as it might have been made.

Having said all that I deem necessary about the two specific districts upon which the decision of this court is to depend, I will simply add a few general observations that may be quite as useful in pointing out the limitations upon the jurisdiction of the judicial department as in defining the extensive scope of legislative power. Under our theory of government all power is primarily lodged in the people. For practical purposes this power has been delegated to three departments, which are co-ordinate, but not necessarily in all respects co-equal. The legislative, executive and judicial departments, respectively, have powers as to which each is supreme. The power to make laws is manifestly superior to that of interpreting or executing them. Therefore, the legislative function is to that extent, and at least theoretically, paramount in dignity and efficiency to the executive and judicial functions. This I conceive to be one of the underlying principles which support the legal presumption that every statute pertaining to matters that are within the acknowledged powers of the legislature is valid and constitutional. This presumption can only be overcome by contrary proof that amounts to a demonstration. (*Fletcher* v. *Peck*, 6 Cranch, 87; *Ex parte M'Collum*, 1 Cow. 564; *Morris* v. *People*, 3 Denio, 381.) "Before courts will deem it their duty to declare an act of the legislature void as in violation of some provision of the Constitution, a case must be presented in which there can be no rational doubt. The incompatibility of the legislative enactment with the Constitution must be manifest and unequivocal." (*People ex rel. Carter* v. *Rice, supra.*) This general rule as to the presumptive validity of legislative action is accentuated when applied to a statute providing for a reapportionment of the inhabitants of the state, because the power to adjust and readjust the political divisions of a sovereignty is as purely political when exercised by the legislature as when exercised by the people. The mere fact that this power, when exercised by the legislature, is a delegated

one, does not change its nature; it is always political, as distinguished from executive or judicial. Nor is it even strictly legislative. The adoption of the statute in which the power finds expression is doubtless a legislative act, but behind and beneath that act is the exercise of a power which is essentially political; the power to form and create subdivisions of the state. When the limitations upon that power are positive and arbitrary, so that the commands of the Constitution can be obeyed with mathematical precision, it follows that any substantial deviation therefrom must be fatal. But when the power is conveyed in language that not only implies but commands the exercise of discretion, it must be deemed a discretion adapted to the practical end sought to be attained; and the execution of such a power pursuant to several co-ordinate but conflicting constitutional commands, some of which are not arbitrary, but are qualified by expressions importing a grant of discretion to the legislature, is clearly beyond the reach of judicial interference unless the abuse of this political discretion is so gross and palpable that there can be no just dispute about it. Any other rule would necessarily involve the usurpation by the courts of the powers granted to the legislature. Upon that particular phase of the question before us, this court has spoken in no uncertain tone. Speaking through PECKHAM, J., it had said: "We do not believe in the propriety or necessity of any such rule. On the contrary, we think the courts have no power in such a case to review the discretion intrusted to the legislature by the Constitution, unless it is plainly and grossly abused." (*People ex rel. Carter* v. *Rice, supra.*) In the same case the same learned jurist shows how plain and gross must be the legislative violation of the Constitution before the courts can interfere with the work of the legislature in making apportionment, and with his very apt words I close this discussion: "There are some inequalities which any one individual intrusted with the power might at once remedy, but which might be very hard to alter when brought under the review of one hundred and twenty-eight assemblymen and thirty-two senators. Local

pride, commercial jealousies and rivalries, diverse interests among the people, together with a difference of views as to the true interests of the localities to be affected, all these things and many others might have weight among the representatives upon the question of apportionment, so that, in order to accomplish any result at all, compromise and conciliation would have to be exercised. Looking to the act as a result of such circumstances, and it seems clear that it cannot be said to be so far a violation of legislative discretion as to cause its complete overthrow by the courts." (*People ex rel. Carter* v. *Rice, supra.*)

For these reasons I vote for the affirmance of the orders made by the courts below.

VANN, WILLARD BARTLETT, JJ. (and GRAY, J., in opinion) concur with CHASE, J., and CULLEN, Ch. J.; HAIGHT and WERNER, JJ., read dissenting opinions; WERNER, J., however, concurs in so much of Chief Judge CULLEN's opinion as deals with the effect of the decision made.

Orders reversed, etc.