**In re Senate Bill 177, Public Act 80, and Senate Bill 83**

[318 A.2d 157]

Nos. 73-72, 132-73, 133-73

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed April 2, 1974

*Robert A. Bloomer, Esq.*, Rutland, *pro se.*

*Corsones & Griffin*, Rutland, for Rutland County Petitioners.

*Kolvoord, Overton & Wilson*, Burlington, for Chittenden County Petitioners.

*Harley Walter Kidder, pro se* intervenor.

*Matthew I. Katz, Esq.*, of *Latham, Eastman, Schweyer & Tetzlaff*, Burlington, for Chittenden County Democratic Petitioners.

*Kimberly B. Cheney*, Attorney General, and *Raymond L. Betts*, Assistant Attorney General, on the brief, for State of Vermont.

**Per Curiam.** These cases involve reapportionment of the Vermont State Senate. The matter began with the legislative apportionment board which, after hearings and study, submitted a reapportionment plan of the Senate to that body. As authorized by 17 V.S.A. § 1907, it was treated as a bill and introduced. The committee to which it was referred amended it completely, and it became Senate Bill 177. This bill ultimately passed as No. 248 of the Public Acts of 1971 (Adjourned Session). As authorized by 17 V.S.A. § 1909, that law was challenged before this Court by a petition and found wanting. *In re Senate Bill 177*, 130 Vt. 358, 294 A.2d 653 (1972).

This Court retained jurisdiction under 17 V.S.A. § 1909(e) and sent the matter back for reconsideration by the legislative apportionment board. A second proposal was then

forthcoming which was also rejected. *In re Senate Bill 177,* 130 Vt. 365, 294 A.2d 657 (1972). The board was then directed to formulate a new plan and submit it to the legislature when it convened for its 1973 session; the Court again retained jurisdiction.

This was done. In lieu of the plan submitted, the legislature adopted Senate Bill 83, which has now been adopted as No. 80 of the Public Acts of 1973. This law was the subject of new petitions for review under 17 V.S.A. § 1909(d), and the issue of reapportionment of the Senate is once more before us, to be considered in the light of the facts reported by the master and the content of No. 80 of the Public Acts of 1973.

This Court's duty with respect to review and disposition is spelled out by statute, 17 V.S.A. § 1909(b) and (f):

> (b) The sole grounds of review to be considered by the supreme court shall be that the apportionment plan, or any part of it, is unconstitutional or violates section 1903 of this title.
>
> (f) The review provided in this section shall be the original and exclusive review of legislative apportionment in the courts of this state.

■ The legislative limits on review underscore the fact that the business of reapportionment, including the selection of alternatives, is a legislative function. Review by this Court will be limited to testing the reapportionment by the appropriate constitutional and statutory standards, even in the presence of alternatives which give the appearance of better representation. *In re Senate Bill 177,* 130 Vt. 358, 361, 294 A.2d 653 (1972).

The reapportionment plan represented by No. 80 of the Public Acts of 1973 sets up districts from which senators shall be elected as follows:

> Addison County plus the towns of Benson, Brandon and Sudbury of Rutland County, population 28,799, two senators—14,399 per senator; Bennington County plus the town of Whitingham of Windham County, population 30,293, two senators—15,147 per senator; Caledonia County minus the town of Newark, plus the towns of Bradford, Newbury, Topsham and West Fairlee of Orange County and the town of Woodbury of Washington

County, population 27,134, two senators—13,567 per senator; Chittenden County minus the town of Colchester, population 90,355, six senators—15,059 per senator; Essex County-Orleans County minus the town of Craftsbury, plus the towns of Newark of Caledonia County and the town of Richford of Franklin County, population 27,197, two senators—13,599 per senator; Franklin County minus the towns of Georgia and Richford, population 27,455, two senators—13,727 per senator; Grand Isle County plus the town of Georgia of Franklin County and Colchester of Chittenden County, population 14,061, one senator; Lamoille County plus the town of Craftsbury of Orleans County, population 13,941, one senator; Orange County minus the towns of Bradford, Newbury, Topsham, and West Fairlee, population 13,586, one senator; Rutland County minus the towns of Benson, Brandon and Sudbury, population 48,104, three senators—16,025 per senator; Washington County minus the town of Woodbury, population 47,260, three senators—15,753 per senator; Windham County minus the towns of Grafton and Whitingham, population 32,000, two senators—16,000 per senator; and Windsor County plus the town of Grafton of Windham County, population 49,547, three senators—14,849 per senator.

The Vermont Constitution, Chapter II, Section 18, sets out the state standards for a representative senate:

The Senate shall be composed of thirty Senators, to be of the freemen of the county for which they are elected, respectively, who shall have attained the age of thirty years, and they shall be elected biennially by the freemen of each county respectively.

The Senators shall be apportioned to the several counties, according to the population, as ascertained by the census taken under the authority of Congress in the year 1910, regard being always had, in such apportionment, to the counties having the largest fraction, and each county being given at least one Senator.

The Legislature shall make a new apportionment of the Senators to the several counties, after the taking of each census of the United States, or after a census taken for the purpose of such apportionment, under the author-

ity of this State, always regarding the above provisions of this section.

The specific requirements critical to this litigation, already mentioned in *In re Senate Bill 177, supra*, 130 Vt. at 362, include (1) a thirty-member senate, (2) that the senators be freemen of the county for which they are elected, (3) that the senators have attained the age of thirty years and be elected biennially by the freemen of their respective counties, (4) that they be apportioned to the several counties according to population, and (5) that each county be given at least one senator.

■■ But state reapportionment is subject also to Federal guidelines, and where there is conflict, not only statutory directives but Vermont constitutional provisions must yield to the Supremacy Clause. *Buckley* v. *Hoff*, 234 F.Supp. 191 (D.Vt. 1964), aff'd *sub nom*. *Parsons* v. *Buckley*, 379 U.S. 359 (1965). As that case states, the standards of the Equal Protection Clause must be met by any Vermont reapportionment plan. With respect to the State Senate, representation on the basis of population is a paramount state requirement. *Mikell* v. *Rousseau*, 123 Vt. 139, 148, 183 A.2d 817 (1962). The *Buckley* case overrode the requirement of a minimum of one senator per county and authorized the combining of counties which became part of our statutory law in 17 V.S.A. § 1907.

■ From these cases and others in the reapportionment area, it is clear that the key demand of the Equal Protection Clause relates to representation founded on a balanced population base. *Reynolds* v. *Sims*, 377 U.S. 533, 577 (1964). Other considerations such as giving each county as presently established at least one senator, or maintaining the integrity of counties as senatorial districts have had to yield. See *Buckley* v. *Hoff, supra*.

This is because the legislature has elected to stay with the thirty-senator membership requirement. In any apportionment related to population, itself a variable, it is possible to maintain both geographic areas and numbers of representatives constant only under fortuitive circumstances involving improbable coincidences, or in a totally stagnant situation. Vermont is not stagnant, and the facts of population

do not fit a situation allowing fidelity to all factors. Some must yield. In the present reapportionment the legislature has elected to breach county lines, while maintaining the integrity of town units.

Having in mind the history of Vermont, first beginning as a group of chartered towns that welded themselves together first as an independent nation, then, fourteen years later as the fourteenth state, it is fitting that the integrity of individual towns be held of high importance. In a very real sense, in Vermont, the state itself is a creation of the towns. Our early constitutional history demonstrates how carefully the towns guarded their control over their creation, and probably accounts for the "one town—one vote" of our early General Assemblies. It was assumed that all towns had a common and equally measured interest in protecting themselves from any centralization of power in state hands. The towns paid the state bills by levies against their grand lists and labored in the legislature to maintain local autonomy.

There was no state senate until 1836. Its purpose was to reflect more closely a population balance in the state, with communities in certain areas beginning to grow. Counties were designated as the election districts for senators.

But counties then had and still have other functions. They operated as judicial districts and probate districts. They were a taxing area for county purposes. Offices such as sheriff and state's attorney were county based. All this, of necessity, lent and still lends a rigidity to county bounds. This was of no great moment for reapportionment purposes prior to *Baker* v. *Carr*, 369 U.S. 186 (1962), and *Reynolds* v. *Sims, supra.*

The shifting of representation according to population under the Vermont Constitution operated under broad limits. It was understood that representation could only approximate population shifts in a Senate of fixed size and counties with unchanging boundaries. Thus the operation could approach fairness only roughly, and only by "regard being always had, in such apportionment to the counties having the largest fraction." Vermont Constitution, Chapter II, Section 18. This directive was to avoid the reassignment of the thirty senators on any basis other than population.

As we have now been told, the requirements of the Equal Protection Clause call for more precision in the allocation

of the constituencies of the thirty senators. The plan before us undertakes to do this by retaining all but one of the counties, and preserving, as far as possible, county lines. Also, very importantly, it does not breach any town lines.

■ This is not inappropriate, since the counties themselves are entirely creations of the legislature, with their boundaries set by statute, not by constitutional mandate. In effect, with respect to the counties' functions as senatorial districts the legislature has redrawn their boundaries, as is its right. If acting as senatorial districts were the only county function, we would treat the act as such a redrafting of the counties. But quite wisely, the legislature has recognized other functions of the old counties which dispose themselves best in terms of boundaries that do not shift as swiftly as population grows and moves. So we have counties redrawn as senatorial districts with regard to their electoral function, justified by the requirements of federal constitutional law. This compulsion makes the process stand outside the absolute requirements of 2 V.S.A. § 16, if, indeed, the petitions brought did not sufficiently fulfill its purpose.

■ All this realignment disposes of the "regard for the largest fraction." First, if the fraction is to be measured at all, it is to be measured against the senatorial districts as set out in the new law, since, for election purposes, they stand as counties. Second, compliance with equal protection standards is a much fairer measure than the rough guide expressed as "largest fraction." So, if the proposal meets federal standards, it is not in violation of that "fraction" test, insofar as it may still have applicability.

■ The opponents contend that the new law does not meet federal standards. Our evaluation of the law and of the findings of the master persuade this Court that those standards are well met. In *Mahan* v. *Howell*, 410 U.S. 315 (1972), a percentage deviation from the ideal norm of representation per general assembly member of 16.4% was upheld. From the findings, the deviation before us varies only by tenths of per cent, being 16.65%.

This is a tempting parallel, but of far more significance are the numbers involved. Vermont is a state of small population.

In over three quarters of the counties there are towns in which the variation of a single registered voter amounts to a one per cent change. The 16.65% previously referred to totals only 2,464 people, whereas the Virginia plan in the *Mahan* case affected some 7,625 people. It seems clear that under the reasoning advanced in *Gaffney* v. *Cummings*, 412 U.S. 735, 37 L.Ed.2d 298 (1973), the present Vermont law is not invidiously discriminatory in violation of the Equal Protection Clause.

It seems equally clear that the reapportionment rests on important interests pointed out as legitimate in the *Gaffney* case. Joint Resolution 10, relating to the apportionment problem, indicated a number of vital considerations for concern in arriving at a plan. Geography is certainly one, with our mountainous spine affecting east-west access and communication. The distribution and size of our population is another as is the presence of towns and groups of towns having long histories of social and economic association, some older than the state itself. All those concerns, as well as the transportation network and the impediments of our winter climate were all available and proper for the general assembly to consider in drafting the law, insofar as the limitations of population representation permitted.

The fulfilling of that population purpose gave rise to some aberrations. Some towns were severed from their natural relationship to Rutland County. The town of Georgia was associated with our island county, Grand Isle, from which it was separated by some of the waters of Lake Champlain. But, in view of the difficulties in reaching an acceptable result state-wide, within the limits of both a thirty-person senate and an acceptable population ratio, while retaining maximum county identity, the wonder is that there were not more and greater dislocations. None of these disqualifies the plan on the basis of the tests this Court is mandated to apply.

A separate objection was urged with respect to Chittenden County as a multi-member district. This is an area of concentrated population, by Vermont standards, and results in a county senatorial district with six senators. Since the inception of the Senate, with thirty members and no more than fourteen counties, multi-member districts were contemplated. Although the legislature, at some time, may deem

it appropriate to change the senatorial district of Chittenden, or to vary county lines, it is not constitutionally required to do so under the facts before us. *Whitcomb* v. *Chavis,* 403 U.S. 124, 142–43 (1971). Again, a demonstration of invidious discrimination must be made, and has not been, in this case. Whatever this Court may believe about the wisdom of an alternative solution, our testing of this legislative function must be confined to its constitutional and statutory propriety, as already noted.

It has also been suggested that this law violates the 15% guideline set out by the legislature when enacting 17 V.S.A. § 1903(b)(2). The short answer is that this guideline, however desirable, has specific application only to the house of representative districts. Moreover, inasmuch as No. 80 of the Public Acts of 1973, now 17 V.S.A. § 1881, is a later enactment, it must be taken to have repealed so much of 17 V.S.A. § 1903(b)(2) as may have applied to senatorial districts and been inconsistent with it.

*It being made to appear that No. 80 of the Public Acts of 1973 is not unconstitutional and does not violate 17 V.S.A. § 1903, the same is affirmed and declared to be of full force and effect.*