963 A.2d 785 (2002)
Senator Clifton BELOW and another,
v.
William M. GARDNER, Secretary of State.
No. 2002-0243.
Supreme Court of New Hampshire.
Argued: June 11, 2002.
Opinion Issued: June 24, 2002.
*786 Wiggin & Nourie, P.A., of Manchester (John P. Kacavas on the memorandum and orally), Shaheen & Gordon, P.A., of Concord (Steven M. Gordon on the memorandum), and Nixon Peabody, L.L.P., of Manchester (W. Scott O'Connell on the memorandum), for the petitioners.
Barry J. Glennon, staff attorney, of Concord, filed no memorandum, for the Secretary of State.
Richard J. Lehmann, senate legal counsel, by memorandum and orally, for the intervenor, the New Hampshire Senate.
Charles G. Douglas, III, of Concord, by memorandum and orally, for the intervenor, the President of the New Hampshire Senate.
PER CURIAM.
"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Part I, Article 11 of the New Hampshire Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantee to the people of New Hampshire the equal right to vote. To assure that right, the supreme court has been called upon to establish a new district plan for the New Hampshire Senate.
This task has fallen to the court because the New Hampshire Legislature failed to enact a new district plan for the New Hampshire Senate following the 2000 census. See N.H. CONST., pt. II, art. 26. Part II, Article 26 of the State Constitution requires the legislature to redistrict the senate at the regular session following every federal decennial census. The New Hampshire Legislature prepared a senate redistricting plan that was passed by both *787 houses, but was vetoed by the Governor. The legislature did not override the Governor's veto and recessed without enacting a valid senate redistricting plan into law.
Under Part II, Article 26, the existing senate districts are not constitutionally apportioned and, thus, violate the equal voting rights of New Hampshire citizens. See U.S. CONST., amend. XIV; N.H. CONST., pt. I, art. 11. Accordingly, the court must redraw the senate districts to preserve the equal protection and equal voting rights of the citizens. See Wilson v. Eu, 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545, 547 (1992).

I. Background and Procedural History
The New Hampshire Senate is comprised of twenty-four single-member district seats. See N.H. CONST., pt. II, arts. 25, 26. The State Constitution requires the legislature to redraw each senate seat into a single member district "as nearly equal as may be in population" every ten years, based upon the federal decennial census. N.H. CONST., pt. II, arts. 11, 26. The senate began the process of redistricting in February 2001.
The legislature received the 2000 census data in March 2001. According to the census, New Hampshire experienced a 10% growth in population between 1990 and 2000, increasing from 1,109,252 citizens in 1990 to 1,235,786 citizens in 2000. This growth was unevenly distributed between the northern and southern portions of the State, however, with the largest population growth occurring in the south. As a result, it is undisputed that following the 2000 census, the existing senate districts, established in 1992 pursuant to the 1990 census, violate both the State and Federal Constitutions. See N.H. CONST., pt. I, art. 11; N.H. CONST., pt. II, art. 26; U.S. CONST., amend. XIV; RSA 662:3 (1996).
Using the 2000 decennial census, the ideal population for each senatorial district is 51,491. The current senatorial districts vary in population from a high of 60,334 (+17.17% deviation from the ideal district population) to a low of 44,229 (-14.10% deviation from the ideal district population). Adding the largest positive deviation and the largest negative deviation, without regard to algebraic sign (absolute value), yields the overall range of deviation. See Abrams v. Johnson, 521 U.S. 74, 98, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997). The overall range of deviation from the ideal population is 31.27%. This is considerably higher than the range permissible under the Federal Constitution for a legislatively drawn district plan. See Brown v. Thomson, 462 U.S. 835, 842-43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (overall range of deviation from ideal district population that is lower than 10% is insufficient to establish a prima facie case of discrimination under Equal Protection Clause of Federal Constitution); Mahan v. Howell, 410 U.S. 315, 329, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (overall range of deviation of 16.4% "may well approach tolerable limits").
In January 2002, after a series of public hearings on a number of proposed redistricting plans, the Republican leadership introduced senate bill (SB) 1, which set forth a proposed new district plan for the senate based upon the 2000 census. SB 1 was passed by both the senate and the house along party lines. The Governor vetoed the bill, however, on March 29, 2002. The senate considered the Governor's veto on May 22, 2002, the last day of its regular session, but was unable to override it. As a result, SB 1 did not become law. See N.H. CONST., pt. II, art. 44 (requiring that "every bill" passed by both houses of the legislature be signed by the Governor before becoming law, unless two-thirds *788 of both houses override the Governor's veto).
The jurisdiction of the court was invoked in April 2002, when eleven senate Democrats filed a petition for original jurisdiction requesting the court to declare the existing State senate districts unconstitutional and to impose a deadline for the legislature to enact a valid senate redistricting plan. Given the need to establish a redistricting plan consistent with constitutional requisites before the 2002 senate election, we accepted jurisdiction. See Monier v. Gallen, 122 N.H. 474, 476, 446 A.2d 454 (1982).
On May 22, 2002, the senate and the house recessed without enacting a valid senate redistricting plan. On May 23, 2002, the court determined, that since it had no assurance that a redistricting plan would be validly enacted in time for the upcoming election, it must establish a constitutional senate redistricting plan. See Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Connor v. Finch, 431 U.S. 407, 415, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977).
The court endeavored to accomplish the task of redistricting the New Hampshire Senate as fairly, efficiently and quickly as possible, given the imminence of the scheduled September primary. It ordered the parties to submit constitutional redistricting proposals by June 6, 2002; new plans submitted after that date were not considered. The court further required that any proposal submitted be based upon the 2000 census data and comply with the constitutional principle of one person/one vote. Oral argument was scheduled and held on June 11, 2002. This decision follows thirteen days after oral argument.
Because this case is an "extraordinary [one] where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role," Reilly v. United States, 863 F.2d 149, 156 (1st Cir.1988), the court informed the parties of its intent to appoint Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor. After reviewing and dismissing the single objection it received regarding Bowers' appointment, the court appointed him as its technical advisor pursuant to its inherent authority. See id. See generally State v. Coon, 974 P.2d 386, 395-96 (Alaska 1999) (discussing authority of courts to appoint expert technical advisors). Bowers was appointed to aid the court in understanding the relevant terminology and technology associated with redistricting, to help the court understand the redistricting plans submitted by the parties, and, where necessary, to assist the court in the technical aspects of the redistricting plan.
The court received four senate district plans for consideration. The court has reviewed each plan in detail and has also considered the written and oral submissions of all parties.

II. Governing Principles
"Reapportionment is primarily a matter of legislative consideration and determination." Monier, 122 N.H. at 476, 446 A.2d 454 (quotation omitted); see Reynolds, 377 U.S. at 586, 84 S.Ct. 1362. "[A] state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality." Connor, 431 U.S. at 414-15, 97 S.Ct. 1828. Thus, we undertake the "unwelcome obligation of performing in the legislature's stead" gingerly, mindful that, as a court, we "possess no distinctive mandate to compromise sometimes conflicting state apportionment *789 policies in the people's name." Id. at 415, 97 S.Ct. 1828. Had the legislature complied with its obligation to reapportion "according to ... constitutional requisites in a timely fashion," our intervention would have been unnecessary. Monier, 122 N.H. at 476, 446 A.2d 454; see Reynolds, 377 U.S. at 586, 84 S.Ct. 1362.

A. One Person/One Vote

1. History of Part II, Article 26
We begin with a discussion of the one person/one vote standard under our own constitution. The New Hampshire Constitution guarantees that each citizen's vote will have equal weight. N.H. CONST., pt. I, art. 11. To ensure this right, Part II, Article 26 of the State Constitution, as amended in 1964, requires that the State be divided into "single-member [senate] districts, as nearly equal as may be in population." N.H. CONST., pt. II, art. 26. This is our first opportunity to interpret the phrase "as nearly equal as may be in population."
This phrase was added to Part II, Article 26 as a result of the Constitutional Convention in 1964. See Journal of Constitutional Convention 305, 317 (1964). Prior to the 1964 amendment, senate districts were apportioned on the basis of taxes, not population. See Levitt v. Maynard, 104 N.H. 243, 245, 182 A.2d 897 (1962). "New Hampshire [was] the only state which ... carried the principle of no taxation without representation to its ultimate conclusion. Its Senate districts [were] determined by the proportion of direct taxes paid by the said districts." Id. (quotations omitted). Prior to 1964, Part II, Article 26 read as follows:
And that the state may be equally represented in the senate, the legislature shall, from time to time divide the state into twenty-four districts, as nearly equal as may be without dividing towns and unincorporated places; and in making this division, they shall govern themselves by the proportion of direct taxes paid by the said districts, and timely make known to the inhabitants of the state the limits of each district.
Id. (quotation omitted).
Even though the constitution required redistricting, before the 1964 amendment the legislature rarely redistricted the senate. Indeed, senate districts drawn in 1915 were not redrawn until 1961. See id.
In 1964, a resolution was introduced at the Constitutional Convention seeking to change the basis for senate apportionment from taxes to population. The matter came to the convention "[a]s a result of recent decisions by the United States Supreme Court" and the concern that "[i]t [was] only a matter of time before our system of apportioning State Senate Districts according to taxable property" was declared unconstitutional. Journal of Constitutional Convention, supra at 48.
Approximately one week after the convention began, the United States District Court for the District of New Hampshire issued its opinion in Levitt v. Stark, 233 F.Supp. 566 (D.N.H.1964). In Levitt, the federal court stated that it "entertain[ed] serious doubt of the federal constitutional validity of the New Hampshire method for selecting the members of the legislature." Levitt, 233 F.Supp. at 569. The court noted, however, that the United States Supreme Court had not yet held that both houses of a bicameral state legislature had to be apportioned on the basis of population, and intimated that if only one of the houses of the New Hampshire Legislature were apportioned on the basis of population, the other house might survive federal court scrutiny. Id.
The convention, at first, wrestled with making changes to the method of apportioning *790 the house of representatives. When this proved too difficult, the convention turned its attention to senate apportionment. Journal of Constitutional Convention, supra at 272. As one of the delegates noted:
I have stood before groups repeatedly and told them that it was not necessary to adjust the House situation as long as we adjusted the Senate situation.... [Y]esterday we did not adjust the House situation so as to make it consonant with what the Supreme Court wants.... But what is important right now is that we put the Senate on a population basis because of the fact that we have left the House as we left it yesterday.... Now if we make our Senate consonant with the principle of equality in representation, then what we did yesterday is fine. If we don't here today make it consonant, we have left ourselves open to question.
Id. at 272-73.
The convention thus resolved to amend Part II, Article 26 to make clear that senate districts would be apportioned based upon population equality and would be redrawn every ten years, following the decennial census. Id. at 280. As a result of the convention's resolution, in November 1964, voters were asked, "Are you in favor of amending the constitution to apportion the senate districts on the basis of population as equally as possible without dividing any town, ward or place?" Id. at 305. Consequently, Part II, Article 26 was amended to state:
And that the state may be equally represented in the senate, the legislature shall divide the state into single-member districts, as nearly equal as may be in population, each consisting of contiguous towns, city wards and unincorporated places, without dividing any town, city ward or unincorporated place. The legislature shall form the single-member districts at its next session after approval of this article by the voters of the state and thereafter at the regular session following each decennial federal census.
N.H. CONST., pt. II, art. 26.
In light of the history of the 1964 amendment to Part II, Article 26, we hold that the phrase "as nearly equal as may be in population" is at least as protective of the citizens' voting rights as the federal constitutional standard of one person/one vote. Accordingly, we need not undertake a separate federal analysis and we base this decision upon Part II, Article 26. See State v. Ball, 124 N.H. 226, 233, 471 A.2d 347 (1983). We rely upon federal cases interpreting the Federal Constitution only to aid in our analysis. See id.

2. Substantive Requirement of One Person/One Vote
Under the State Constitution, "there can be room for but a single constitutional ruleone voter, one vote." Gray v. Sanders, 372 U.S. 368, 382, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (Stewart, J., concurring). Our constitution requires therefore that the State Legislature be apportioned so that each person's vote carries as near equal weight as possible. See Reynolds, 377 U.S. at 588, 84 S.Ct. 1362 (Clark, J., concurring). "[T]he overriding objective [of redistricting] must be substantial equality of population among the various [legislative] districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Id. at 579, 84 S.Ct. 1362. However, a State need not achieve "absolute population equality" with respect to state legislative districts. Karcher v. Daggett, 462 U.S. 725, 732-33, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).
*791 The degree to which a state legislative district plan may vary from absolute population equality depends, in part, upon whether it is implemented by the legislature or by a court. State legislatures have more leeway than courts to devise redistricting plans that vary from absolute population equality. See Chapman v. Meier, 420 U.S. 1, 26-27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).
With respect to "a court plan, any deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features." Id. at 26, 95 S.Ct. 751 (emphasis added). Absent persuasive justifications, a court-ordered redistricting plan of a state legislature "must ordinarily achieve the goal of population equality with little more than de minimis variation." Id. at 26-27, 95 S.Ct. 751. The latitude in court-ordered plans to depart from population equality thus "is considerably narrower than that accorded apportionments devised by state legislatures, and ... the burden of articulating special reasons for following ... a [state] policy in the face of substantial population inequalities is correspondingly higher." Connor, 431 U.S. at 419-20, 97 S.Ct. 1828.
However, "[n]either courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the ... [constitution] the mathematical formula that establishes what range of percentage deviations is permissible, and what is not." Mahan, 410 U.S. at 329, 93 S.Ct. 979.
The senate and senate president argue that because we are a state court, we should use the standard applied to state legislatures rather than the standard applied to federal district courts. We disagree.
All courts called upon to make redistricting decisions are governed by the same measure of restraint. Unlike legislatures, courts engaged in redistricting primarily view the task through the lens of the one person/one vote principle and all other considerations are given less weight. See Connor, 431 U.S. at 415, 97 S.Ct. 1828. "The framers in their wisdom entrusted this decennial exercise to the legislative branch because the give-and-take of the legislative process, involving as it does representatives elected by the people to make precisely these sorts of political and policy decisions, is preferable to any other." Jensen v. Wisconsin Elections Bd., 249 Wis.2d 706, 639 N.W.2d 537, 540 (2002). We believe, therefore, that we too must accomplish our task "circumspectly, and in a manner free from any taint of arbitrariness or discrimination," Connor, 431 U.S. at 415, 97 S.Ct. 1828 (quotation omitted), and that the high standard that governs a federal court-enacted redistricting plan applies to any plan we adopt.

B. Other State Constitutional Principles
In addition to requiring that senate districts be "as equal as may be in population," the New Hampshire Constitution mandates that: (1) senate districts be comprised of "contiguous" towns, city wards and unincorporated places; (2) no town, city ward or unincorporated place may be divided unless the town, city ward or unincorporated place requests division by referendum; and (3) each senate district must elect only one senator. N.H. CONST., pt. II, arts. 26, 26-a. These additional requirements, however, are secondary to the overriding constitutional principle of one person/one vote. See In re Legislative Districting, 299 Md. 658, 475 A.2d 428, 439 (1984); In re Senate Bill 177, 132 Vt. 282, 318 A.2d 157, 160 (1974); *792 Rice v. English, 835 So.2d 157, 172 (Ala. 2002).
Contiguity may be a valid consideration is primarily a matter of legislative in districting a state legislative body. See Reynolds, 377 U.S. at 578-79, 84 S.Ct. 1362. "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme." Id. at 578, 84 S.Ct. 1362. Courts generally agree that contiguous territory is territory that touches, adjoins or is connected, as distinguished from territory that is separated by other territory. See In re Legislative Districting, 475 A.2d at 436; Hickel, 846 P.2d at 45; In re Sherill, 188 N.Y. 185, 81 N.E. 124, 131 (1907).
Other States considering similar constitutional provisions have held that the contiguity requirement is intended to prevent partisan gerrymandering. See In re Legislative Districting, 475 A.2d at 436; see also Reynolds, 377 U.S. at 578-79, 84 S.Ct. 1362. Political gerrymandering is "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Black's Law Dictionary 696 (7th ed. 1999); see also Hickel v. Southeast Conference, 846 P.2d 38, 45 (Alaska 1992).
The State Constitution also requires that each of the twenty-four senate districts be single-member districts, which means that each district elects only one senator.

III. Plans Submitted by the Parties
We have reviewed each submitted plan against the neutral constitutional principles set forth above.

A. Petitioners' Plan
The petitioners assert their plan is a "least change" approach, in which they endeavored to maintain "constituency consistency" to the "greatest extent practicable." They aver that the overall range of deviation from the ideal senate district population in their plan is 4%.
The petitioners' plan is flawed because it does not rest entirely upon the federal census data, as required by law. "Our State Constitution establishes only one yardstick as a legislative guide in making an apportionment. That yardstick is the last general census of the inhabitants of the state taken by authority of the United States or of this state." McGovern v. Secretary of State, 138 N.H. 128, 131, 635 A.2d 498 (1993) (quotation omitted).
While data from the federal census (referred to as PL 94-171 census data) reflects ward populations based upon the ward lines in effect as of April 1, 2000, some of the data used by the petitioners reflect ward populations based upon the ward lines changed after April 1, 2000. Some of the ward populations used by the petitioners are not the same as the ward populations contained in the PL 94-171 census data. For example, the petitioners use an adjusted population of 9,088 for Manchester ward 6, while the population for Manchester ward 6 is 10,678 in the PL 94-171 census data. Thus, there are some discrepancies between the petitioners' ward populations and the PL 94-171 census data ward populations.
The petitioners used the PL 94-171 census data for all city wards except those in the cities of Claremont, Rochester, Manchester, Keene, Nashua and Dover. When the PL 94-171 data is substituted for those cities, the overall range of population deviation is actually 7.92%. In addition, the petitioners' plan changes the senate districts *793 for 32.89% of the State's population (406,493 citizens) and district 7 is no longer comprised of contiguous territory.
The senate president argues that the petitioners' plan artificially divides the cities of Concord, Laconia and Dover for partisan political advantage. The senate president also argues that some of the districts in the petitioners' plan are oddly shaped and are not comprised of contiguous territory for the sole purpose of protecting Democrat incumbents and targeting Republican incumbents. For instance, one district contains both a ward of the city of Manchester and a ward of the city of Nashua, even though these wards do not touch by land, but instead border a common waterway.
Even if the senate president's criticisms are accurate, we note that while these types of political considerations may be permissible in legislatively-implemented redistricting plans, they have no place in a court-ordered remedial plan. See Wilson, 4 Cal.Rptr.2d 379, 823 P.2d at 576-77; see also Wyche v. Madison Parish Police Jury, 769 F.2d 265, 268 (5th Cir.1985) (per curiam).

B. Senate President's Plans
The senate president has proposed two alternative plans for the court's consideration. The first plan is a "compromise plan," which the senate president asserts "is the next closest plan to the legislature's intent." According to the senate president, the "compromise plan" represents the results of weeks of negotiation between the senate Republicans and Democrats. It is said to combine elements of SB 1, the plan supported by the Republicans, and of the plan supported by the Democrats and submitted by the petitioners, and is alleged to have an overall range of population deviation of 9.83%. The second plan is a "deviation plan," which the senate president asserts has an overall range of deviation of less than 4% from the ideal district population.
Both plans are flawed for the same reasons as are the petitioners' plans. Like the petitioners, the senate president did not rely solely upon federal census data, but instead relied upon ward population data that differed from the data reported in the federal census.
The senate president's "compromise plan" used the PL 94-171 census data base for all city wards except for those in Manchester and Nashua. When the PL 94-171 data is substituted for those cities, the overall range of population deviation is actually 9.2%, and the plan changes the senate districts for 24.10% of the State's population (297,846 citizens).
The senate president's "deviation plan" used the PL 94-171 census data base for all city wards except those in Manchester, Nashua and Concord. When the PL 94-171 data is substituted for those cities, the overall range of population deviation is actually 5.4%, and the plan changes the senate districts for 34.74% of the State's population (429,310 citizens).
As with the petitioners' plan, the plans submitted by the senate president embody political considerations. Although the senate president claims the "compromise plan" is a product of weeks of negotiation between senate Republicans and Democrats, it was not adopted. The "deviation plan" is similarly laden with political considerations. Although SB 1 was modified to achieve a lower overall range of deviation, the plan is in many respects similar to the plan supported by senate Republicans and rejected by senate Democrats.

C. Senate Plan
The senate has submitted the plan contained in SB 1, with some minor modifications. *794 We do not adopt the senate's proposed plan for the same reasons that we do not adopt the other submitted plans. The senate's proposed plan does not rest entirely upon federal census data. When the PL 94-171 data is substituted, the senate plan's overall range of population deviation is actually 9.66%.
Like the other submitted plans, the senate's plan changes the senate districts of a significant portion of the State's population. It changes the districts for 31.10% of the State's population (384,391 citizens). Also, like the other submitted plans, the senate's plan seeks partisan advantage. It is most similar to SB 1, the plan supported by senate Republicans and opposed by senate Democrats.

D. SB 1
The senate and senate president argue that we must either order elections to take place pursuant to SB 1 or use it as our starting point in devising a redistricting plan of our own. We decline both options for the reasons set forth below.
We do not adopt SB 1 as the court's plan because, like the other plans submitted by the parties, it fails to comply with the neutral constitutional criteria required of court-ordered remedial plans. Like the plans submitted by the parties, SB 1 does not rely exclusively upon PL 94-171 census data. SB 1 relies upon ward population data that differs from the data reported to the federal census. Additionally, like the plans submitted by the parties, SB 1 represents "the culmination of very specific political and, in some cases, individual agendas." Colleton County Council v. McConnell, 201 F.Supp.2d 618, 652 (D.S.C. 2002).
For these same reasons, we also decline to use SB 1 as our template, although as with the plans submitted by the parties, we examined it for evidence of State redistricting policy. Even though SB 1 was passed by the legislature, it did not become law, and, thus, while it is some evidence of State redistricting policy, it is not entitled to the judicial deference accorded fully enacted redistricting plans. See Prosser v. Elections Bd., 793 F.Supp. 859, 867 (W.D.Wis.1992). Only fully enacted plans "have the virtue of political legitimacy." Id.
For all of the above reasons, we conclude that none of the submitted plans is appropriate for adoption by the court. As explained above, each plan relies upon different data. Each plan has "calculated partisan political consequences (the details of which are unknown). We have no principled way to choose [among] the plans, especially knowing that we would be endorsing an unknown but intended political consequence by the choice we make." Wilson, 4 Cal.Rptr.2d 379, 823 P.2d at 576-77. Accordingly, the court has devised a redistricting plan consistent with neutral State and federal constitutional principles.

IV. Court Plan
The goal of the court's plan is to remedy the constitutional deficiencies in the existing senate districts. In devising the plan, we are guided primarily by the State and federal constitutional principles of one person/one vote. Also, we use as our benchmark the existing senate districts because the senate districting plan enacted in 1992 is the last validly enacted plan and is the "clearest expression of the legislature's intent." Colleton County Council, 201 F.Supp.2d at 649. We consider the 1992 senate plan to be the best evidence of State redistricting policy. In addition, by using the existing senate districts, we are able to ensure, to the greatest extent practicable, that each senatorial district contains roughly the same constituents as the *795 last validly enacted plan. And, we adhere to the New Hampshire constitutional requirements that each senate district be a single-member district comprised of contiguous towns, city wards and unincorporated places and that each town, city ward and unincorporated place not be divided. N.H. CONST., pt. II, art. 26.
With these principles in mind, we have determined that to remedy the population deviations in existing districts, it is preferable that the core of those districts be maintained, while contiguous populations are added or subtracted as necessary to correct the population deviations.
The court's plan has an overall range of deviation of only 4.96%, and, thus, satisfies the one person/one vote standard.
As referred to above, the court was informed that, in certain cities, ward lines may have been changed since the 2000 census was conducted, and that it was not known whether such changes were made using the PL 94-171 census data. For example, we have been advised that Manchester and Nashua have adjusted ward lines since the 2000 census data was released, making these ward lines inconsistent with the PL 94-171 data as reported for those wards. We have also been advised that Rochester has added a ward since the 2000 census data was released, making its wards similarly inconsistent with the PL 94-171 data.
However, because no party provided us with all of the necessary data, the court's plan relies exclusively upon the PL 94-171 census data, which was provided by the Bureau of the Census for redistricting purposes. Wherever such changes have been made, it will be the responsibility of the appropriate officials to conform the ward lines to the PL 94-171 data or to make internal election process accommodations.
Further, unlike the plans submitted by the parties, the court's plan imposes the least change for New Hampshire citizens in that it changes the senate districts for only 18.82% of the State's population (232,565 citizens).
Moreover, all of the court's senate districts are single-member districts and they are each comprised of contiguous towns, city wards and unincorporated places. N.H. CONST., pt. II, art. 26. Consistent with the New Hampshire Constitution, the court's plan does not divide any town, city ward or unincorporated place throughout the entire State. The plan also splits only two cities, Manchester and Nashua, which were also split in the redistricting plan enacted in 1992. The plan is drawn without any consideration of partisan politics.
Because the legislature failed to meet the mandate of Part II, Article 26 of the New Hampshire Constitution, the court has been called upon to assure that that requirement is met. It is in fulfillment of that requirement that the court has adopted the plan for formation of senate districts attached to this opinion. This plan is effective immediately and the injunction against the senate filing period is dissolved as of 12:01 a.m. June 26, 2002. Unless otherwise ordered by the court, the filing of any motion to reconsider shall not stay the effective date of the plan.
So ordered.
BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.
PER CURIAM.
In Case No. 2002-0243, Petition of Senator Clifton Below & a., the court on July 11, 2002, issued the following order:
Before the court is the Senate President's motion to reconsider the court's opinion, issued June 24, 2002. Attached to his motion are affidavits from the Nashua *796 and Manchester city clerks explaining how the clerks created new ward boundaries for their respective cities. For the first time, the court was advised that they claimed to have used federal census block equivalency data in adjusting ward lines. In a companion case, Petition of Representative Peter Burling & a., the court received the official maps of Nashua and Manchester showing the ward boundaries as adjusted after the 2000 census and certified copies of the Nashua and Manchester city charters as amended to reflect the ward boundaries changed after the 2000 census. The new ward boundaries differ from the ward boundaries used by the court in establishing a new district plan for the New Hampshire Senate. The Senate President asks, among other things, that the court amend the district plan for the Senate by using the current ward lines for Nashua and Manchester.
It is helpful to review the events leading to the filing of this motion. The jurisdiction of this court was invoked in April 2002, when eleven senate Democrats filed a petition for original jurisdiction requesting the court to declare the existing State senate districts unconstitutional and to impose a deadline for the legislature to enact a valid senate redistricting plan. Given the need to establish a redistricting plan consistent with constitutional requisites before the 2002 senate election, we accepted jurisdiction. On May 22, 2002, the senate and the house recessed without enacting a valid senate redistricting plan. On May 23, 2002, the court determined, that since it had no assurance that a redistricting plan would be validly enacted in time for the upcoming election, it must establish a constitutional senate redistricting plan.
The court endeavored to accomplish the task of redistricting the New Hampshire Senate as fairly, efficiently and quickly as possible, given the imminence of the scheduled September primary. It ordered the parties to submit constitutional redistricting proposals by June 6, 2002. To ensure that the apportionment plan for the New Hampshire Senate was based upon the last general census of the inhabitants of the state taken by authority of the United States or of this state, the court ordered that any redistricting plan submitted by the parties use PL 94-171 census data and that it be provided as a census block equivalency file. On June 5, 2002, the Senate filed a motion alleging that following the 2000 census, New Hampshire's cities received census data from the census bureau and proceeded to redraw their city ward lines. The Senate alleged that "it is likely that ward lines drawn by New Hampshire cities may not correspond with the block files requested in the court's order." The court on June 5 issued an order permitting the parties to submit plans based on ward lines drawn as a result of the 2000 federal census. The court specifically noted that it was expressing no opinion as to whether any such plan would satisfy the federal and state constitutional principle of one person/one vote, and invited the parties to address that issue in their pleadings and at oral argument.
The court received the plans submitted by the parties on or before June 6, 2002. The plans submitted by the parties indicated that they were based upon ward boundaries drawn after the 2000 federal census was conducted. None of the plans submitted by the parties identified the ward boundaries changed after the 2000 census was conducted, the location of the new ward boundaries, or the data from which the changed ward boundaries were derived.
Thus, on June 10, 2002, in the companion case of Petition of Representative Peter Burling & a., the court attempted to obtain additional information regarding *797 the changes alleged to have been made by cities to their ward lines by ordering the New Hampshire House of Representatives to provide the court, in written and electronic form, the block equivalency files showing ward changes made by any city based upon the 2000 federal census figures. The House of Representatives responded that it was unable to comply with this request before oral argument on June 11, 2002.
Oral arguments in both this case and Petition of Representative Peter Burling & a were held on June 11. At oral argument, the court stated that "we need the [census] block equivalency files to show what census blocks were shifted from ward to ward ... in order for us to construct a plan.... We just have to know what pieces of the census data have been changed as a result of these ward changes" and asked who had this information. During a recess, the Clerk of Court asked counsel for the Secretary of State to provide the court with information about any ward boundary changes made after the 2000 census was conducted and, specifically, to identify the census blocks affected by the ward boundary changes. Counsel for the Secretary of State said that the Secretary of State did not have this information.
During oral argument in the companion case, counsel for the House of Representatives informed the court that "only one city... uses census blocks [to change its ward boundaries], and that's Dover." Counsel further informed the court that while the cities of Manchester and Nashua had both changed their ward boundaries after the 2000 census was conducted, neither city used census block data to make these changes; both cities "used streets" to make changes to their ward boundaries.
Because our State Constitution requires that any apportionment plan be based upon the last federal decennial census, see N.H. CONST., pt. II, arts. 9, 11, 26, the court then informed the parties that "in the absence of the data, hearing that most of the cities haven't used the census data, and to expedite the process we're in, we're going to have to rely upon the unadjusted PL 94-171 census data for those wards."
After oral argument, no party provided the court with the requisite data. On June 24, 2002, the court issued its district plan for the Senate. The plan relied upon the unadjusted PL 94-171 census data for the entire State, including those cities that adjusted their ward boundaries after the 2000 census was conducted. The court ordered that the filing period for candidates for the Senate would run from June 26 to July 5, 2002.
In their response to the Senate President's motion, the petitioners disputed the accuracy of the population figures for the new wards provided in the affidavit of the Nashua city clerk. The court determined that in both Nashua and Manchester, there appeared to be discrepancies between the populations of the wards reconfigured after the 2000 census, as reported by the city clerks in their affidavits and as reported in the federal census data. The discrepancies in Manchester were relatively minor; however, in Nashua, the discrepancies were substantial and in both wards 7 and 8 exceeded 2,000 people.
By order dated July 5, 2002, the court set forth a list showing what it believed were the populations for the newly-configured wards by census block. The court ordered that if any party did not agree that the federal census data figures as set forth on the list were accurate, that party should state the party's reasons for disagreement in a pleading to be submitted by July 9, 2002. The parties agreed that several of the figures in the Nashua city clerk's affidavit that was filed with the Senate President's motion to reconsider *798 were erroneous; several of the parties filed a new affidavit from the Nashua city clerk agreeing that the court's figures, which are set forth below, are accurate:
NASHUA
Ward 1: The population reported in the federal census data for ward 1 as currently configured is 9,551.
Ward 2: The population reported in the federal census data for ward 2 as currently configured is 9,704.
Ward 3: The population reported in the federal census data for ward 3 as currently configured is 9,698.
Ward 4: The population reported in the federal census data for ward 4 as currently configured is 9,943.
Ward 5: The population reported in the federal census data for ward 5 as currently configured is 9,625.
Ward 6: The population reported in the federal census data for ward 6 as currently configured is 9,252.
Ward 7: The population reported in the federal census data for ward 7 as currently configured is 7,438.
Ward 8: The population reported in the federal census data for ward 8 as currently configured is 11,816.
Ward 9: The population reported in the federal census data for ward 9 as currently configured is 9,578.
With respect to Manchester, the Senate President, the Senate, and the Secretary of State disagreed with the populations for wards 5, 6, 7, 8 and 9 listed in the court's July 5 order. They provided a memorandum from the Office of the City Clerk of the City of Manchester (memorandum) explaining the discrepancies in certain wards. A review of the parties' responses reveals that the following discrepancies remain.
MANCHESTER
Ward 1: The population reported in the federal census data for ward 1 as currently configured is 9,033.
Ward 2: The population reported in the federal census data for ward 2 as currently configured is 9,073.
Ward 3: The population reported in the federal census data for ward 3 as currently configured is 9,013.
Ward 4: The population reported in the federal census data for ward 4 as currently configured is 8,900.
Ward 5: The population reported in the federal census data for ward 5 as currently configured is 9,070. The memorandum indicates that this figure should be 9,072.
Ward 6: The population reported in the federal census data for ward 6 as currently configured is 8,978. The memorandum indicates that this figure should be 9,008.
Ward 7: The population reported in the federal census data for ward 7 as currently configured is 9,070. The memorandum indicates that this figure should be 9,052.
Ward 8: The population reported in the federal census data for ward 8 as currently configured is 8,921.
Ward 9: The population reported in the federal census data for ward 9 as currently configured is 8,846.
Ward 10: The population reported in the federal census data for ward 10 as currently configured is 8,715.
Ward 11: The population reported in the federal census data for ward 11 as currently configured is 8,708.
Ward 12: The population reported in the federal census data for ward 12 as currently configured is 8,679.
Thus, it appears that the court has finally been provided with sufficient corrected *799 information to enable it to consider the new ward lines adopted by the cities of Nashua and Manchester. At this late date, given that the court has already issued a district plan upon which citizens may have relied, and that the filing period for candidates for the senate has expired, the court will not undertake a wholesale revision of the plan it issued on June 24. In order to ensure that its plan complies with the State constitutional requirement that senate districts not divide any city ward, however, the court grants the Senate President's motion in part. See N.H. CONST, pt. II., art. 26.
Manchester wards 5, 6, and 7, which are the only wards the populations of which are still in question, are all located in the court plan in Senate District 18. The difference between these totals is de minimis, and the discrepancies among the three wards are irrelevant in this proceeding if all three wards remain in the same Senate District. Thus, we need not and do not decide in this proceeding which numbers are accurate. Accordingly, in this proceeding we will continue to use the population reported in the federal census data for Manchester wards 5, 6 and 7 as set forth above.
The court's district plan shall be amended to use the current ward boundaries for the cities of Nashua and Manchester as set forth in the certified copies of the Nashua and Manchester city charters amended to reflect the ward boundaries changed after the 2000 census. Senate District 12 shall be amended to consist of New Ipswich, Mason, Brookline, Hollis, and Nashua wards 1, 2, 3 and 7; Senate District 13 shall be amended to consist of Nashua wards 4, 5, 6, 8 and 9. The remaining Senate Districts shall be unchanged from our opinion dated June 24, 2002. As so amended, the court's plan has an overall range of deviation of 5.46%, and, thus, satisfies the one person/one vote standard.
In addition, the amended plan furthers the court's goal of imposing the least change for New Hampshire citizens in that it changes the senate districts for even fewer people than the court's June 24 plan. The amended plan changes the senate districts for only 16% of the State's population (197,689 people). The reason for this improvement is that fewer wards in Nashua are changed to different senate districts in the amended plan.
The Senate President asserts that the Nashua City Clerk has indicated that Nashua is likely to adjust its ward boundaries in the future. The Senate President contends that if the city does so, this may greatly increase the total deviation of Senate Districts 12 and 13. Senate Districts 12 and 13 are today drawn using the current ward boundaries adopted by, and in place in, the City of Nashua. The boundaries of Senate Districts 12 and 13 are hereby fixed, and will not be affected if the city adjusts its ward boundaries in the future. Should the city choose to adjust its ward boundaries in such a way that they no longer coincide with the boundaries between senate districts, then it will be the responsibility of the appropriate officials to make internal election process accommodations.
The filing period provided in RSA 655:14, for purposes of the 2002 senatorial election, shall be extended until July 18, 2002, only for candidates in those Senate Districts affected by this order (Senate Districts 12, 13, 16, 18 and 20).
The slip opinion issued on June 24, 2002, is modified by deleting the Index to Appendices and the appendices themselves, and by replacing them with the following Index to Appendices and the appendices attached to this order.

*800 INDEX TO APPENDICES

Senate District Plan (State Map) .........................................Appendix A
Senate District Population Report ........................................Appendix B
Full Geography Report with Population Totals .............................Appendix C

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.

*801 
*802 
*803 
*804 
*805 
*806 
*807 
*808